1148

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.**

**INFOSYS LIMITED,**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

Case: 5:26-cv-13585
Assigned To : Levy, Judith E.
Referral Judge: Patti, Anthony P.
Assign. Date : 9/22/2026
Description: CMP JANE DOE V. INFOSYS LIMITED ET AL (AB)

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

---

Plaintiff, Jane Doe, proceeding pro se, hereby files this Complaint against Defendants, Infosys Limited, Sanjay Sharma, and Rakesh Gollapalli, jointly and severally, for severe sex discrimination, race discrimination, age discrimination, national origin discrimination, a hostile work environment, and egregious retaliatory discharge. Plaintiff respectfully alleges as follows in support of her claims:

## INTRODUCTION / NATURE OF THE ACTION

1. Plaintiff brings this civil rights action to remedy unlawful employment practices involving discrimination, harassment, a hostile work environment, and retaliatory termination perpetrated by Defendant

**Infosys Limited, Defendant Sanjay Sharma, and Defendant Rakesh Gollapalli**, jointly and severally, in direct violation of **Title VII of the Civil Rights Act of 1964**, the **Age Discrimination in Employment Act (ADEA)**, and the **Michigan Elliott-Larsen Civil Rights Act (ELCRA)**.

2. This case does not involve a standard performance or commercial separation. Rather, it concerns a severe, unified transaction of workplace sexual victimization, physical grooming, and an intentional, malicious corporate cover-up culminating in the retaliatory discharge of a highly accomplished female professional.

3. Pursuant to the **Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (EFAA), 9 U.S.C. §§ 401–402**, Plaintiff hereby explicitly elects to **invalidate and void** any pre-dispute mandatory arbitration agreements or joint-action waivers executed with Defendant. Because this dispute alleges severe, employer-substantiated sexual harassment and physical sexual victimization, the EFAA guarantees Plaintiff's absolute right to resolve her entire multi-count employment dispute in a court of law.

**JURISDICTION AND VENUE**

4. This Court has subject-matter jurisdiction over Plaintiff's federal statutory claims pursuant to **28 U.S.C. § 1331** (federal question jurisdiction), **42 U.S.C. § 2000e-5(f)(3)** (Title VII jurisdiction), and **29 U.S.C. § 626(c)** (ADEA jurisdiction).

5. This Court has supplemental jurisdiction over Plaintiff's state law claims against Defendant Infosys Limited, Defendant Sanjay Sharma, and Defendant Rakesh Gollapalli under Michigan's Elliott-Larsen Civil Rights Act (ELCRA) pursuant to **28 U.S.C. § 1367**, because the federal and state claims arise from an identical nucleus of operative facts and form part of the same constitutional case or controversy.

6. Venue is proper in the U.S. District Court for the Eastern District of Michigan, Southern Division, pursuant to the specific Title VII venue statute, **42 U.S.C. § 2000e-5(f)(3)**. Plaintiff performed her contractual sales operations, managed her major multi-million dollar commercial accounts, and **would have continued to work** within this judicial district but for the unlawful, discriminatory, and retaliatory practices perpetrated by Defendant.

7. Venue is further independently supported under the general venue statute, **28 U.S.C. § 1391(b)(2)**, because a substantial part of the

events giving rise to the employment relationship, account transitions, operational deliverables, and subsequent retaliatory discharge occurred or were anchored within this judicial district.

8. Venue is conclusively established by the explicit contractual parameters drafted and enforced by Defendant. Under Section VIII (**"PLACE OF ARBITRATION"**) of Defendant's Mutual Arbitration Agreement, the designated geographic forum is the county in which the employee **"applied to work, works, or worked at the time the dispute or claim arose."** *(attached hereto as **Exhibit 14**, "Infosys Mutual Arbitration Agreement")*

9. On May 7, 2021, Plaintiff applied to work and accepted an offer of employment from Defendant formally addressed to her in **Detroit, Michigan (Wayne County)**, within this judicial district *(attached hereto as **Exhibit 17**, "Infosys Offer Letter").*

10. Following an interim account assignment, Plaintiff was formally transferred back to Defendant's Detroit-based sales team in July 2022. From July 2022 continuously through her retaliatory termination on August 25, 2025, Plaintiff was directly aligned with Defendant's Detroit-based Midwest Automotive practice group, reported to a

manager based in Michigan, and regularly performed her remote sales duties within the State of Michigan. *(attached hereto as* ***Exhibit 2****, "Infosys Job Description – Work Location Job Details")*

11. Defendant operates a virtual, localized team structure for its entire Detroit automotive sales vertical, making the absence of a brick-and-mortar office space a standard, uniform corporate framework for all similarly situated sales team members rather than an anomaly unique to Plaintiff.

12. Because Defendant contractually bound its employment dispute resolution framework to the specific location where Plaintiff **"applied to work, works, or worked,"** Defendant is legally and equitably estopped from objecting to the Eastern District of Michigan as an improper, inconvenient, or non-jurisdictional forum for this litigation.

13. Plaintiff has fully exhausted her administrative remedies. Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). The EEOC issued a Notice of Right to Sue, and Plaintiff has filed this Complaint within the strict, mandatory **90-day statutory timeline**. All exhibits referenced in this Complaint and listed in Plaintiff's Index of Exhibits are attached

hereto, made an integral part hereof, and incorporated by reference into each and every count as though fully set forth herein *(attached hereto as **Exhibit 18**, "EEOC – Right to Sue Letter")*.

**THE PARTIES**

14. Plaintiff, proceeding under the pseudonym **Jane Doe**, is an African American/Black female citizen of the United States over the age of 40. At all times relevant to this action, Plaintiff was a highly accomplished senior sales professional employed by Defendant as a Senior Engagement Manager (Job Level 7A) within Defendant's Detroit, Michigan-based Midwest Automotive sales practice group.

15. Defendant **Infosys Limited** is a foreign corporation organized under the laws of India, with its principal United States corporate headquarters located at 2400 N. Glenville Drive, Richardson, Texas 75082.

16. At all times relevant, Defendant was and continues to be an employer engaged in an industry affecting interstate commerce, maintaining a continuous, systemic, and multi-million dollar business presence in the State of Michigan, and employing more than 500 individuals, thereby satisfying the statutory criteria and employee

thresholds of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act (ADEA).

17. Defendant maintains an active corporate presence in Michigan and may be formally served with process via its designated Michigan Registered Agent: **C T Corporation System**, located at 40600 Ann Arbor Rd E, Suite 201, Plymouth, Michigan 48170.

18. Defendant Sanjay Sharma is an individual who, at all times relevant to the allegations herein, was employed by Defendant Infosys Limited as a Senior Engagement Manager (Job Level 7A) and subsequently promoted to Associate Vice President (AVP). At all times relevant, Defendant Sharma acted as Plaintiff's direct reporting manager, exercised supervisory and operational control over Plaintiff's terms, conditions, and privileges of employment, and acted as an agent and supervisor within the meaning of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL § 37.2101 et seq., thereby subjecting him to individual, joint, and several liability.

19. Defendant Rakesh Gollapalli is an individual who, at all times relevant to the allegations herein, was employed by Defendant Infosys Limited as Vice President, and subsequently promoted to

Senior Vice President, serving as the Industry Head and Business Unit Leader for Defendant Infosys Limited's Americas Automotive practice group. At all times relevant, Defendant Gollapalli exercised executive oversight, directed corporate account transitions, controlled vertical personnel decisions, and acted as an agent and supervisor within the meaning of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL § 37.2101 et seq., thereby subjecting him to individual, joint, and several liability.

## PLAINTIFF'S UNIQUE REMOTE FIELD SALES VENUE MATRIX

20. Plaintiff is a multi-state property owner with residential ties across multiple jurisdictions. Plaintiff does not rely on local property ownership or her primary overnight residential sleeping address to establish venue in this judicial district.

21. Rather, Plaintiff's employment baseline is governed by her status as an active, mobile remote field sales professional whose corporate assignment, account territory footprint, and professional infrastructure were strictly tied to a designated corporate vertical.

22. On May 7, 2021, Defendant formally extended a written offer of employment to Plaintiff, which was formally addressed and delivered to Plaintiff at her **Detroit, Michigan** [redacted] *(attached hereto as **Exhibit 17**, "Infosys Offer Letter").*

23. The original position for which Plaintiff applied, and which she subsequently accepted, was designated explicitly in the corporate job description and offer parameters as a **Detroit-based sales role**.

24. This formal Detroit-based onboarding and initial placement establishes an ironclad contractual nexus aligned perfectly with the language of Section VIII of Defendant's own Mutual Arbitration Agreement, identifying this geographic area as the location where Plaintiff **"applied to work"**.

25. Defendant does not maintain a commercial, brick-and-mortar office space for its automotive sales team within the state of Michigan. Operating a virtual, centralized, and localized remote sales practice group is Defendant's standard operating procedure for the entire Detroit automotive practice, not an anomaly unique to Plaintiff.

26. Following a temporary interim corporate account reassignment, Plaintiff was formally transferred back to Defendant's Detroit-based team and sales role in July 2022.

27. From July 2022 continuously through her retaliatory termination on August 25, 2025, Plaintiff remained a member of the Detroit-based team, directly aligned with the Detroit Midwest Automotive practice group, and regularly performed her remote sales and telework duties within the State of Michigan.

28. When Plaintiff was formally transferred back to the Detroit-based team in July 2022, her entire management reporting structure changed, her accounts changed, and her team members changed. Plaintiff was required to undergo a formal interview with the reporting manager over that specific team, who was physically located in Michigan, for approval to join his team.

29. Consequently, pursuant to the explicit text of Defendant's own Mutual Arbitration Agreement Section VIII, this judicial district represents the definitive forum where Plaintiff contractually **"applied to work, works, or worked at the time the dispute or claim arose"** *(attached hereto as **Exhibit 14**, "Mutual Arbitration Agreement")*.

## STATEMENT OF FACTS

### A. Plaintiff's History of Exemplary Performance, Accolades, and Leadership Roles

30. Plaintiff is a highly qualified, senior corporate leader possessing decades of specialized automotive engineering, commercial sales execution, and client management experience.

31. Throughout her employment with Defendant, Plaintiff was an active, high-profile culture and diversity champion within the organization, serving both as an appointed corporate Culture Ambassador and as the formal Chair of Defendant's Women's Employee Resource Group (ERG).

32. Despite her high qualifications, upon onboarding, Defendant systematically began a continuous pattern of excluding Plaintiff from core client accounts, denying her critical account ownership, and blocking her from participation in standard leadership team meetings.

33. Specifically, from May 17, 2021, through October 10, 2023, a period of approximately thirty (30) months, Defendant completely failed to assign Plaintiff a Master Customer Owner (MCO) mapping designation within its core system architectures.

34. Corporate records, including formal human resources communications from Business Partner HR (BPHR) representative Kratika Gupta, explicitly confirm that Defendant's internal tracking systems registered "Zero Actuals" flowing into Plaintiff's system-generated Revenue Key Performance Indicators (KPIs) precisely because management failed to map her as an MCO or portfolio owner for any active account *(attached hereto as **Exhibit 9**, "Kratika Gupta, BPHR email – Performance Rating Revenue KPI Showing as Zero Actuals, No Account Assignment")*.

35. Baseline target metrics were completely unreachable due to this exclusion; despite Defendant's systemic failure to assign active portfolios to Plaintiff, her historical performance metrics under un-manipulated reporting lines consistently demonstrated excellence and high-value contributions.

36. For the performance appraisal cycles spanning from her hire date through late 2022, during periods when Defendant evaluated her based on core professional competency and objective sales baseline actions rather than absent data fields, Plaintiff continuously received ratings of "Met Expectations" from her reporting managers.

37. During the performance review cycle ending in late 2023 under the reporting management of Senior Manager Rod Crain, Plaintiff achieved an objective target attainment metric of 83.62%, which Defendant formally reviewed and rated as "Met Expectations".

38. Reflecting the bad-faith structural hurdles weaponized against her, for the July 13, 2023, payout cycle, Plaintiff was assigned a baseline **target bonus metric of $50,228**, yet she was issued a severely reduced payout of **$13,059.31, the absolute lowest bonus payout on her entire team**.

39. Reporting manager Rod Crain subsequently disclosed to Plaintiff that he had been explicitly instructed and directed by senior leadership to artificially suppress Plaintiff's performance ratings and financial bonus outcomes, despite the fact that Defendant had completely failed to provide her with an active account assignment to generate competing metrics.

39.1. Plaintiff's exceptional performance and commercial execution were further validated by high-level global corporate executives. On May 31, 2023, Senior Vice President Charles Salameh issued a formal, company-wide electronic

transmission directed to Industry Head Rakesh Gollapalli and Segment Head Jasmeet Singh regarding the high-stakes Ford Titan Program and AutoTech event, explicitly stating: ***'Natalie did an excellent job defining the investment – better than most I get so give her props for getting the budget from me***. A copy of this written evaluation is *attached hereto as* ***Exhibit 12***.

40. During the subsequent fiscal performance cycle ending December 20, 2024, Plaintiff generated an extraordinary, system-recorded baseline target attainment score of 90.68%.

41. Within that 90.68% overall cumulative score, Plaintiff achieved individual performance metrics reaching as high as 125%, which represents the absolute maximum attainment ceiling permitted by Defendant's system-generated performance tracking applications. Despite this high attainment number, ***Plaintiff received a "Needs Improvement" rating***.

42. Plaintiff's exceptional professional capabilities were heavily validated by advanced educational credentials held during her tenure, including **earning two (2) executive leadership certifications from**

**Stanford University and an executive certification in Artificial Intelligence (AI) from Northwestern University's Kellogg School of Management**. *(Note: Plaintiff's enrollment and progress toward her subsequent Chief Data and AI Officer [CDAIO] credentials at the University of Michigan represent continuing professional achievements).*

43. Recognizing this superior subject-matter expertise, Defendant's corporate **Alliance team requested that Plaintiff head their AI-enabled tech solution with high-value partner Dassault Systemes**.

44. On August 1, 2025, just twenty-four (24) days prior to her sudden retaliatory termination, Defendant's corporate marketing division formally selected and notified Plaintiff that she was the designated winner of Defendant's prestigious "Client Advocacy Award - Guardians of the MFG Galaxy" presentation for the first quarter of the fiscal year *(attached hereto as **Exhibit 13**, "Client Advocacy Award – Urgent Email on August 1, 2025").*

45. This formal selection required Plaintiff to submit a professional headshot to corporate marketing for explicit inclusion in the official executive award deck.

46. On the morning of August 25, 2025, the exact day of her termination, Plaintiff remained a highly active, un-replaced core member of the business vertical, so much so that her terminating manager explicitly questioned her regarding the current operational status of her multi-million dollar active client proposals.

47. Plaintiff's institutional indispensability and operational value were so deeply embedded that **for two (2) months following her unlawful termination, former teammates continuously contacted Plaintiff requesting operational assistance**, project support, and critical guidance on active client accounts because they relied entirely on her specialized knowledge and client relationships.

**B. The Early Origins of Discrimination: Systematic Exclusion from the Toyota Account and Unlawful Demotions**

48. The structural discrimination and disparate treatment Plaintiff experienced culminated in her termination but originated shortly after her onboarding on the high-profile Toyota account portfolio.

49. On June 24, 2021, Senior Vice President and Vertical Business Unit Leader Rakesh Gollapalli issued an explicit written directive to account leads Kartik Bisht and Hanuman, stating: *"Please finalize the goals for* Jane *and help her update the same in the system. Also, you and Hanuman please start orienting* Jane *to the account and start introducing her to various client stakeholders."*

50. On August 10, 2021, a formal corporate email announcement broadcasted to the entire vertical practice confirmed the structural account mappings, explicitly designating the Toyota account leadership team as: *"Toyota account –* Jane *and Kartik."*

51. Despite these explicit executive mandates establishing Plaintiff (a Senior Engagement Manager, Job Level 7A) as a co-leader of the Toyota account portfolio, lower-level Indian male team members actively blocked, marginalized, and excluded her from the account structure.

52. Throughout her assignment, Plaintiff was subjected to a hostile, demeaning, and systematic campaign of isolation executed by her peers, Kartik Bisht and Gaurav Agarwal, designed to strip her of her

executive functions and relegate her to the status of an administrative secretary.

53. To orchestrate her failure and ensure she could not achieve her system-generated performance metrics, Bisht and Agarwal completely barred Plaintiff from standard client interaction, enforcing the following restrictions:

a) Plaintiff was never formally introduced to any core client stakeholders on the Toyota account;

b) Plaintiff was completely barred from attending core client-facing meetings];

c) Plaintiff was intentionally excluded from participating in the Toyota Quarterly Business Reviews (QBR) and Toyota Account team planning sessions;

d) Plaintiff was entirely shut out from receiving access to account contracts, operational documentation, and live revenue-generating opportunities within the sales pipeline; and

e) The singular client-facing event where Plaintiff was allowed to actively participate was limited strictly to **Toyota's Supplier Diversity conference**, where she was explicitly instructed to

perform the functions of an administrative secretary rather than an executive peer.

54. Rather than correcting this severe peer misconduct, Senior Vice President Rakesh Gollapalli actively validated it, using the hostility of lower-level male employees to justify stripping Plaintiff of her core automotive responsibilities.

55. To institutionalize this exclusion, Defendant forced Plaintiff into a series of unlawful reporting relationships that degraded her senior rank, requiring her to report to individuals holding the exact same or a lower job level than her own, despite her extensive automotive sales experience.

56. On May 16, 2022, Rakesh Gollapalli executed a disciplinary and adverse "Transition of Portfolio," completely removing Plaintiff from the Toyota account and transferring her to the Aerospace and Defense vertical under the management of Rajiv Kumar *(attached hereto as **Exhibit 3**, "Rakesh Gollapalli (VP, now SVP, Infosys Limited) – Response to Toyota Complaints")*.

57. This transfer operated as a severe punitive demotion; Plaintiff had specifically mapped her senior career toward automotive-focused

vertical frameworks, a background listed explicitly by management as her core strength. Moving her to an entirely separate industry vertical where she lacked specialized experience was designed to destabilize her employment baseline.

58. On May 18, 2022, and June 2, 2022, Plaintiff escalated these actions to Human Resources Business Partner Sukanya Bose via formal written complaints, explicitly detailing her systematic exclusion from the account, the demeaning attacks she endured from male peers, and her retaliatory removal from the automotive portfolio *(attached hereto as **Exhibit 4**, "Sukanya Bose, BPHR – Initial Email re: Toyota Issues and Concerns (May 18, 2022)").*

59. On June 3, 2022, Plaintiff submitted a comprehensive, final demand letter to Human Resources, notifying the company that her removal from the automotive track was a direct punishment for reporting peer misconduct, stating: *"Transitioning me away from that role is a punishment. It is a punishment for someone else's bad behavior towards me that is now being made to be about me and my performance. That is unacceptable." (attached hereto as **Exhibit 6**, "Letter to Sukanya Bose, BPHR – re: Transition to New Portfolio (June 3, 2025)".*

60. Just weeks later, on July 16, 2022, Defendant transferred Plaintiff back to the Detroit-based team under Senior Manager Rod Crain. This timeline reveals an unsettling corporate reality: on July 26, 2022, Plaintiff and Manager Rod Crain personally witnessed a corporate email transmission from Senior Executive Jasmeet Singh explicitly stating that the company *"still needs a female on Toyota,"* proving that while Defendant was using artificial diversity metrics to satisfy commercial gender quotas, they were actively bartering, marginalizing, and excluding the actual senior Black female professional on their staff.

**C. Direct Evidence of National Origin Bias: The Explicit "Indian Culture" Admission**

61. The systemic exclusion of Plaintiff from leadership opportunities, account ownership, and commercial promotions was driven by an overt, top-down preference for Indian nationals, constituting direct evidence of national origin discrimination under Title VII.

62. Throughout Plaintiff's tenure, the institutional leadership structure reporting to Vice President Rakesh Gollapalli, now Senior

Vice President, consisted entirely of male employees, the vast majority of whom were of foreign, non-American descent.

63. On June 27, 2023, at approximately 3:00 PM Eastern Time, Plaintiff participated in a formal performance review and leadership strategy discussion with Rakesh Gollapalli.

64. During this meeting, Plaintiff directly questioned Gollapalli as to why she, a Senior Engagement Manager (Job Level 7A) with decades of senior domestic automotive expertise, was continuously excluded from the core leadership team, denied account leadership responsibilities, and blocked from account ownership.

65. In response to Plaintiff's inquiry, Senior Vice President Rakesh Gollapalli provided an explicit, unvarnished corporate justification, stating directly to Plaintiff that **"Indian culture is very sensitive about who they report to."**

66. This direct admission serves as explicit evidence that Defendant utilized unlawful national origin, cultural, and gender criteria to construct its corporate reporting lines, systematically blocking qualified American professionals from managing accounts or exercising leadership over Indian male subordinates.

67. Following this admission, Defendant consistently favored a lower-level Indian male employee, Employee F (Job Level 7B), who joined the company after Plaintiff and possessed far less senior sales experience.

68. Defendant routinely stripped active, high-performing legacy team members of their multi-million dollar client achievements to enrich Employee F's portfolio, systematically transferring lucrative accounts to Bendi after their original creators were marginalized, hit with "Needs Improvement" ratings, or forced out. Specifically, Defendant reassigned the *Hitachi Astemo* account (originally won by Employee D) and the *Joyson*, *Visteon*, and *Lear* accounts (all originally won by Employee C) directly to Employee F.

69. Furthermore, Defendant systematically stripped Plaintiff of commercial accolades and visibility to enrich Bendi's profile, funding his high-profile travel opportunities and bestowing corporate awards upon him for events (such as *AutoTech 2024*) that were entirely organized and single-handedly executed by Plaintiff. A copy of this written evaluation is *attached hereto as* ***Exhibits 10 and 11***.

**D. Systemic Age Discrimination: Sanjay Sharma's Statistically Devastating Purge Metric**

68. On August 1, 2024, Defendant transferred Plaintiff's reporting structure to Manager Sanjay Sharma. Upon assuming control of this team, Sharma initiated a coordinated, systematic campaign to purge older, historically high-performing professionals from the organization.

69. The performance evaluation metrics engineered by Manager Sanjay Sharma for the H1 fiscal cycle reveal an absolute, statistically devastating correlation between advanced age and negative performance reviews under the Age Discrimination in Employment Act (ADEA):

| Employee Name | Citizenship / Origin | Approximate Age | Stated Performance Rating | Ultimate Employment Outcome |
|---|---|---|---|---|
| **Jane Doe (Plaintiff)** | **American / Non-Indian** | **58** | **Needs Improvement (NI)** | **Retaliatory Termination** |

| | | | | |
|---|---|---|---|---|
| **Employee B** | Indian National | 60+ | Needs Improvement (NI) | Separated from Employment |
| **Employee C** | Indian / American | 60+ | Needs Improvement (NI) | Separated from Employment |
| **Employee D** | American / Non-Indian | 64+ | Needs Improvement (NI) | Terminated by Company |
| | | | | |
| **Rod Crain** | American / Non-Indian | 60+ | Needs Improvement (NI) | Terminated by Company |
| **Employee F** | Indian National | 51 | Met Expectations or Above | Retained and Promoted] |

| | | | | |
|---|---|---|---|---|
| **Employee G** | American / Non-Indian | ~30 | Met Expectations or Above | Retained by Company |
| **Employee H** | Non-Indian | 30+ | Met Expectations or Above | Retained and Promoted |

70. Under Manager Sanjay Sharma's direct purview, **100% of the employees aged 58 and older were universally hit with negative "Needs Improvement" ratings**, completely cross-cutting nationality and origin, while exclusively punishing advanced age.

71. Conversely, substantially younger employees such as Employee G (~30) and Employee H (30+) were uniformly insulated from negative reviews, retained, and promoted.

72. This mathematical uniformity demonstrates that the "Needs Improvement" ratings issued to Plaintiff were not a reflection of objective professional output, but were part of an illegitimate, age-biased data-cleansing process used to force out senior, veteran personnel.

**E. The Coordinated Multi-Layered Transaction of Harassment, Grooming, and Physical Victimization in Ohio**

73. The discriminatory and exclusionary environment Plaintiff was subjected to directly enabled a highly toxic, dangerous, and abusive workplace, culminating in a coordinated multi-layered transaction of sexual harassment, predatory grooming, and severe physical victimization.

74. On April 29, 2025, while attending an employer-sponsored corporate offsite in Ohio involving an overnight hotel stay, Plaintiff was subjected to rapid, sequential, and highly calculated misconduct executed back-to-back by two superior male corporate executives.

a) The coordinated transaction of physical harassment began the moment Plaintiff arrived at the employer-sponsored overnight venue in Ohio. While checking into the front desk, the corporate Vice President intentionally positioned himself directly adjacent to Plaintiff, listened to the desk clerk, and loudly broadcasted and announced Plaintiff's confidential hotel room number out loud to the surrounding space, ensuring the manager and

surrounding male leadership possessed the exact physical coordinates of her overnight quarters."

75. Near the end of the evening, a male corporate Vice President cornered Plaintiff as she prepared to leave, pulling out a chair and ordering her to remain seated.

76. With Plaintiff physically in the chair the Vice President had pulled out for her, the Vice President executed an unwelcome, non-consensual romantic vocal performance, utilizing a foreign language barrier to obscure the highly intimate and inappropriate nature of the interaction from general bystander comprehension. The predatory nature of this overture was so objectively apparent that English-speaking establishment staff members independently intervened to ask Plaintiff if she understood the lyrics, explicitly defining the interaction as an un-orchestrated 'serenade' directed solely at her.".

77. The Vice President concluded his non-consensual performance by switching to English, stating directly to Plaintiff: Jane***, I love you.'*** Plaintiff perceived this rapid transition from a linguistically obscured romantic overture to a targeted English declaration of love

as a highly coordinated grooming phase designed to psychologically destabilize her immediately prior to the next executive interaction."

78. Within seconds of this severe boundary violation, while Plaintiff was still isolated in the chair and processing the shock of the Vice President's romantic entrapment, her direct male manager, Sanjay Sharma, approached her from behind.

79. Manager Sanjay Sharma tapped Plaintiff on the shoulder, stated he had "something" for her, and verbally framed it as **"the good stuff."**

80. Manager Sharma then physically isolated Plaintiff, moving her entirely away from the remaining corporate team members to an outdoor patio area.

81. Once outside, Sharma handed Plaintiff an unauthorized, undisclosed, and un-tubed psychoactive, mind-altering substance, telling her: *"This is for you."*

a) At the time Manager Sanjay Sharma handed Plaintiff the raw, un-tubed substance, Plaintiff was the most commercially active representative on the vertical team, having single-handedly rescued a multi-million dollar account and successfully

managed a severely dissatisfied customer. Plaintiff accepted the item hoping it represented a professional olive branch and a congratulatory token to offset their prior adversarial history in celebration of her high-performance metrics.

b) While there are legitimate business reasons to provide a high-performing subordinate a celebratory gift, there is no lawful or professional justification for a male manager to surreptitiously hand a female subordinate an obscured, undisclosed, and concealed identity central nervous system depressant under any circumstances. Because high-potency tetrahydrocannabinol (THC) is recognized in forensic and toxicological fields as a primary drug-facilitated sexual assault (DFSA) agent used to induce rapid physical helplessness and memory amnesia, Plaintiff reasonably processed this rapid sequence—the loud room disclosure, the romantic serenade, and the immediate drug delivery—as a unified, predatory chemical ambush based strictly on her sex."

82. Because the substance was handed to her raw out of its container while Sharma concealed the packaging, and because it

structurally resembled a commercial tobacco product, Plaintiff initially believed the item to be a standard cigar.

83. Upon lighting the product, Plaintiff immediately recognized by the smell that it was marijuana. Plaintiff refused to inhale or consume the intoxicating agent, immediately extinguished it, and left the event site in severe distress.

84. Plaintiff subsequently recovered the discarded outer packaging from the scene, which prominently displayed high-visibility warnings, including bold block text reading **"THC-A"**, **"KNOCKOUT BLEND"**, and a **"21+"** age restriction seal *(attached hereto as **Exhibit 7**, "Drug Facilitated Sexual Assault (DFSA) Agent – THC Product Packaging")*.

85. Because an undisclosed, high-potency intoxicating agent such as THC-A operates as a highly dangerous drug-facilitated sexual assault ("DFSA") agent, Plaintiff reasonably experienced and processed these rapid, sequential actions by her Vice President and Manager as a unified transaction of predatory grooming, severe sexual harassment, and physical victimization.

86. This physical trauma was intentionally intensified by the manager's active alteration of the product. The manufacturer's

packaging confirms that the product is distributed with a distinct, factory-twisted hemp lighting tip, which serves as the universal visual signifier of a cannabis joint *(attached hereto as **Exhibit 7**, "Drug Facilitated Sexual Assault (DFSA) Agent – THC Product Packaging")*.

87. Prior to isolating Plaintiff and provisioning the drug, Manager Sanjay Sharma purposefully cut or removed the factory-twisted lighting tip, flattening the end so that it would structurally mimic a standard, non-intoxicating commercial cigar, thereby executing an act of deliberate physical deception and fraudulent concealment.

88. The company's subsequent handling of this physical violation exacerbated the hostile and toxic work environment, demonstrating a shocking, malicious indifference to Plaintiff's civil rights and safety.

89. During the subsequent internal investigation, Manager Sanjay Sharma, now promoted to AVP, formally admitted to the physical procurement, concealment, alteration, and provisioning of the psychoactive drug to his female subordinate.

a) During the August 14, 2025, closure meeting, Employee Relations investigator David Raley explicitly confirmed that the manager admitted to providing the undisclosed drug exactly as

Plaintiff described, locking down the physical facts of her sexual harassment claim. However, the company executed an egregious administrative loophole, internally categorizing Plaintiff merely as a 'witness' to the matter rather than the primary complainant."

b) This classification represents a calculated, bad-faith attempt to minimize corporate liability and shield leadership. When Plaintiff directly asked 'why me?' and demanded to know why the manager secretly targeted her with a concealed psychoactive substance, Defendant's ER department completely refused to provide an answer. This total failure to communicate and investigate the supervisor's predatory intent constitutes a continuing theme of corporate concealment, deliberately silencing a fully corroborated victim to preserve an abusive leadership ring."

90. Rather than terminating or demoting the confessed perpetrator, Defendant actively validated the hostile work environment by rewarding Sharma. Weeks after his formal drug admission, **Defendant stripped Plaintiff of her hard-earned, marketing-approved "Client Advocacy Award" and transferred the honor**

**directly to the perpetrator, AVP Sanjay Sharma**, plastering his face across the official corporate executive deck as a celebrated corporate "Guardian." *(attached hereto as **Exhibit 13**, "Client Advocacy Award – Urgent Email on August 1. 2025")*.

91. Forcing a verified victim of physical executive grooming to continue reporting to her admitted assailant, while watching the company strip away her own professional accolades to bestow them upon him represents an egregious corporate ratification of sexual harassment and a malicious, bad-faith perversion of Title VII and ELCRA safety standards.

**STATEMENT OF FACTS**

**F. The Sham Employee Relations Investigation and the Falsified Gas Station Narrative**

92. Following Plaintiff's formal reports to management, Human Resources, and Employee Relations regarding executive misconduct and sex discrimination, Defendant engineered a highly compromised, superficial, and bad-faith administrative investigation.

93. The primary objective of Defendant's Employee Relations (ER) department was not to safeguard Plaintiff from severe physical

victimization, but rather to construct a defensive shield to protect AVP Management personnel, insulate the corporation from Title VII liability, and rationalize the downstream termination of Plaintiff.

94. Throughout the entirety of the internal investigation, which remained open from approximately June 11, 2025, through August 14, 2025, Defendant maintained the perpetrator, now AVP Sanjay Sharma, in a position of direct, unchecked corporate authority over Plaintiff.

95. Defendant explicitly forced Plaintiff to remain under the direct reporting line, operational oversight, and performance purview of her admitted assailant, completely refusing to separate the parties or implement safety boundaries despite being on actual notice that the underlying misconduct involved the surreptitious provisioning of an un-tubed psychoactive drug.

96. This mandatory, continuous reporting structure forced Plaintiff to operate within an intensely hostile, toxic, and psychologically hazardous work environment. It subjected her to ongoing supervisory intimidation, accusatory and adversarial treatment from Sharma, and

continuous fear of structural retaliation while she desperately attempted to manage multi-million dollar corporate accounts.

97. During the initial intake interview on June 11, 2025, ER Investigator David Raley explicitly noted the predatory isolation of the act, stating: **"And there was no context or explanation of why he was giving it to you. He just said, 'I have something for you and it's the good stuff.' That's all he said."** Plaintiff responded: **"That's all he said. But I was also in shock... almost felt like coded language... And I've not felt safe or protected. And I'm going to tell you right now, I really don't feel safe or protected, even in this moment. I have to say that out loud."**

98. Highlighting the objective abnormality of an executive target transaction, ER Investigator Sheila Cernicka questioned: **"I'm trying to picture this as a movie. Why would he ever approach? Why do you think he would ever approach you with that?"** Plaintiff answered: **"And I can't own that... I feel caught... So I felt very alone and vulnerable after this happened."** At the close of intake, the male ER investigator admitted the egregious nature of the act: **"I don't think you're off base here. You know, when you talk about the inappropriateness of this type of action, obviously this is**

**something that we wouldn't want to happen in our workplace. And we don't want anybody to be subject to something like this."**

99. On August 14, 2025, at approximately 2:39 PM Eastern Time, ER investigator David Raley conducted a formal case closure phone call with Plaintiff, witnessed by human resources representative Tena Bracy.

100. During this formal call, Employee Relations explicitly confirmed that the perpetrator, AVP Sanjay Sharma, verbally admitted to his intentional actions regarding the procurement, concealment, and provisioning of the "Knockout Blend" THC pre-roll to Plaintiff.

101. Specifically, Investigator David Raley explicitly confirmed the chemical alteration and substantiation of the charge, stating: **"I figured based on the images that you shared that it was actually, you know... a product that had THC in it, which is the psychedelic or high portion of that particular substance. And so what we determined was that you in fact were given that product... So, to be clear, we did corroborate."**

102. To insulate the corporation and validate the retention of the supervisor, Employee Relations actively lent its own credibility to an inherently implausible and logistically fabricated narrative provided by Sharma. David Raley asserted that Sharma claimed he made a mistake, stating: **"He apparently Sanjay had purchased from like a local gas station there. I think it's the gas station right across the street... and grabbed several things... And even if Sanjay, you know, made a mistake and bought a product he didn't know was that kind of product, it still violated our policy."**

103. When Plaintiff noted her physical research into the manufacturing origin, stating, **"I also researched the product because what was extremely concerning to me was the California piece,"** Investigator Raley actively defended the local gas station sourcing narrative to protect the manager, stating: **"So it does come out of California. I'm very familiar with it now because I researched it very in-depth... but I actually researched it to the point where I inquired with the actual gas station. So I literally confirmed that product is sold in that gas station and many others... Yeah, no, I verified it."**

104. Plaintiff directly confronted Defendant's bad-faith refusal to investigate predatory intent, asking: **"And the person saying that is a person who decided to give me drugs. If you picked up 20 things over at this gas station, why did you decide to give me drugs? Why are you valuing me so low? So, a guy who tells you that he bought this thing from this counter and gave these drugs to me, you had 20 things, why'd you give me that thing? Why did you give it to me?"**

105. Investigator David Raley sat in total silence, completely refusing to answer. When Plaintiff repeated the question word-for-word, Raley deflected entirely, stating only: **"Yeah, and again, we took action there because it did violate our policy, and it should not have happened. So to be clear, we did corroborate."**

106. Plaintiff immediately went on the recorded transcript record objecting to this bad-faith administrative cover-up, stating: **"No, I understand that. But the point I'm making in this moment is, this is still the guy who holds my career in his hand... Well, I just do want to say this part, David, that, you know, now I do feel like I have been discriminated against inside of this process. And I do.**

**Because if you're not going to speak factually about it, then I don't understand why."**

107. Plaintiff immediately conducted her own telephonic and physical site inspections on August 14, 15, 16, and 17, 2025. The gas station owner/manager emphatically confirmed that the store did not carry or stock the product at any time, and Plaintiff personally observed all age-gated hemp/tobacco products were locked directly behind the clerk's counter, completely inaccessible to open-shelf or accidental customer retrieval.

108. The physical layout and statement of the store's ownership conclusively proved that Defendant's Employee Relations department fabricated its claims of retail verification. ER deliberately accepted a mathematically and physically impossible narrative to cover up an executive's physical misconduct, utilizing a sham closure to preserve the harasser while clearing the runway for Plaintiff's immediate termination.

## G. The Pretextual Termination Timeline, Home Exposure, and Shifting Explanations

109. On August 25, 2025, just eleven (11) days after the sham Employee Relations investigation was closed, Defendant executed the adverse employment action of terminating Plaintiff's employment.

110. The termination was delivered verbally via a phone call executed by the perpetrator himself, AVP Sanjay Sharma, joined by HR Representative, Michelle Bedell. During the very call in which he severed her employment for alleged performance deficiencies, Sharma explicitly asked Plaintiff if she had received any updates regarding the active, multi-million dollar client proposals she was leading, proving she was actively generating commercial value up to her final moments with the organization." A copy of Plaintiff's Performance Log and Pipeline Comparison are *attached hereto as* ***Exhibits 8 and 15***.

111. Later that afternoon, on August 25, 2025, at 12:17 PM, Unit Manager of Business Partner HR Michelle Bedell issued the official separation paperwork via email, formally stating: *"The decision to terminate your employment is based on your performance during the last performance appraisal cycle and is in line with Infosys Policies and Processes."* This stated justification was in direct violation of Defendant's public corporate declarations issued on June 30, 2025,

and April 15, 2026, wherein Infosys explicitly guaranteed a **"zero-tolerance approach to any form of harassment or discrimination"** and promised a protected **"speak-up culture."**

a) *"On June 30, 2025, during the same period as Plaintiffs sexual harassment Employee Relations investigation, a woman employee at Infosys' Electronic City campus... discovered an employe] in the adjacent stall... recording her using a mobile phone... With the support of a female HR colleague, the woman checked [the] phone and found the video clip saved on it... Infosys immediately terminated his employment and reiterated its zero-tolerance approach.", which is attached hereto as* ***Exhibit 19a and 19b****, "Public Corporate Governance Declarations on Harassment Policies" and incorporated herein by reference.*

112. Demonstrating a continuing campaign of bad faith, intentional retaliation, and severe disregard for Plaintiff's physical safety, Unit Manager Michelle Bedell explicitly included the perpetrator, AVP Sanjay Sharma, on the carbon copy ("Cc") line of the termination electronic transmission.

113. Embedded directly within the body of that shared corporate email, Defendant exposed Plaintiff's highly confidential personal details, including her exact overnight residential address: [redacted].

114. Plaintiff had explicitly requested not to share her residential address within the open chat infrastructure during the afternoon termination call, transmitting the data privately to Human Resources specifically to shield her physical location from her admitted assailant.

115. By overriding Plaintiff's explicit safety objections and publishing her physical residential address directly to the supervisor who had surreptitiously cornered her and administered a flat-tipped, concealed "Knockout Blend" intoxicating agent, Defendant committed an egregious act of ongoing retaliation, creating severe psychological distress and placing the victim in a state of continuous physical vulnerability.

116. Plaintiff immediately went on the written electronic record at 4:53 PM on August 25, 2025, escalating her distress to Human Resources and stating: *"I mentioned that I was not comfortable sharing my address while we were on this afternoon's call. However, I*

*see that you have included Sanjay Sharma in this email, which includes my address. This is very concerning for me because I have safety concerns regarding someone (Sanjay Sharma) who feels comfortable 'gifting' an illicit marijuana product to me that includes the words 'Knockout Blend' and has access to my home details." (attached hereto as* ***Exhibit 16****, "Email – re: Plaintiff's Residential Address Revealed to Sanjay Sharma by HR").*

117. Following her separation, Defendant attempted to completely shield its illegal retaliation by asserting a series of shifting, contradictory, and incompatible justifications before administrative bodies.

118. While Defendant informed Plaintiff and her corporate file that she was fired solely for **poor job performance**, Defendant subsequently submitted a formal response to the Texas Workforce Commission seeking to block her unemployment benefits by altering its narrative and characterizing her separation as **willful misconduct**.

*119.* On October 14, 2025, the Texas Workforce Commission issued an official Benefit Determination completely rejecting Defendant's

shifting allegations, ruling that the off-duty incident Defendant cited as the basis for firing her was not connected with the work and did not constitute misconduct under the law *(attached hereto as **Exhibit 1**, "Texas Workforce Commission Unemployment Benefit Determination").*

120. Under established Sixth Circuit jurisprudence, Defendant's irreconcilable shift from a "performance-based" termination narrative to an administrative "willful misconduct" claim serves as direct, objective evidence of **pretext**, proving that Defendant's stated reasons are manufactured cover-ups designed to hide a coordinated campaign of race, sex, age, and national origin discrimination.

**CAUSES OF ACTION**

**COUNT I**

**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**

**(Against Defendant Infosys Limited)**

121. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 120 of this Complaint as if fully set forth herein.

122. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a), makes it an unlawful employment practice for an employer to discriminate or retaliate against an employee because that employee has opposed any practice made an unlawful employment practice by Title VII, or because the employee made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.

123. Plaintiff engaged in continuous, protected activity within the meaning of Title VII by repeatedly opposing, reporting, and escalating systemic discrimination, national origin bias, hostile work environment metrics, and extreme physical executive misconduct to Defendant's Human Resources and Employee Relations departments.

124. Specifically, Plaintiff's protected activities included, but were not limited to:

a) Formal written complaints to BPHR regarding systemic exclusion and account reassignments on May 18, 2022, and June 2, 2022;

b) Escalation of a final administrative demand letter to HR regarding discriminatory penalties and isolation on June 3, 2022;

c) Formal complaints to senior human resources personnel regarding demographic exclusion and age-based marginalization in January

2024;

d) Actively reporting severe supervisory physical misconduct and undisclosed drugging to a member of management on May 21, 2025;

e) Explicit, mandatory participation in a formal internal Employee Relations investigation regarding her complaints of discrimination, bias, and executive misconduct on June 11, 2025;

f) Formally filing an internal performance review appeal and actively participating in the independent *HEAR* review panel on July 22, 2025; and

g) Actively participating in the formal Employee Relations investigation case closure proceeding on August 14, 2025.

125. Defendant had actual and constructive knowledge of Plaintiff's protected activities, as its own human resources and internal compliance officers directly processed, recorded, and closed her investigative files.

126. Eleven (11) days after Defendant closed the internal investigation, wherein its own agents explicitly confirmed to Plaintiff that her account of her supervisor surreptitiously administering a concealed, altered psychoactive drug was fully "corroborated, open,

honest, and substantiated", Defendant subjected Plaintiff to an adverse employment action by abruptly terminating her employment.

127. Defendant's decision to execute a retaliatory termination just eleven (11) days after the closure of a **substantiated physical sexual harassment file** satisfies the strict standard of tight **temporal proximity** established under Sixth Circuit jurisprudence to conclusively infer a causal link between an employee's protected activity and an adverse discharge.

128. Defendant's stated reason for terminating Plaintiff, alleged "poor performance", is a fabrication, an artificial cover-up, and a legal **pretext** for unlawful retaliation.

129. The pretextual nature of Defendant's narrative is demonstrated by objective, system-generated corporate records, including:

a) Plaintiff generating an outstanding, un-manipulated cumulative baseline target attainment score of 90.68%, with individual performance categories capped at the system's absolute 125% performance ceiling in the prior cycle that was labeled "Needs Improvement" rating;

b) Senior Vice President Charles Salameh issuing a company-wide

directive to Industry Head Rakesh Gollapalli stating that Plaintiff did an *"excellent job... better than most,"* and ordering management to *"give her props"*;

c) Defendant formally selecting Plaintiff as the winner of its prestigious "Client Advocacy Award" just twenty-four (24) days prior to her termination;

d) The terminating supervisor, AVP Sanjay Sharma, explicitly seeking operational account guidance and proposal tracking data from Plaintiff during the actual termination phone call; and

e) Defendant's submission of contradictory, irreconcilable, and shifting justifications across administrative bodies, telling the court Plaintiff was fired for "performance" while retroactively telling the Unemployment Commission she was terminated for "willful misconduct" to block her benefits.

130. As a direct and proximate result of Defendant's willful, malicious, and retaliatory actions, Plaintiff has suffered and continues to suffer severe economic injury, loss of past and future earnings, loss of substantial corporate benefits, loss of professional advancement, profound reputational damage within her specialized industry vertical, and severe emotional and physical distress.

## COUNT II

## Hostile Work Environment / Sexual Harassment in Violation of Title VII of the Civil Rights Act of 1964

## (Against Defendant Infosys Limited)

131. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 130 of this Complaint as if fully set forth herein.

132. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1), prohibits an employer from discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's sex or gender, which includes **prohibiting the creation or toleration of a sexually hostile, abusive, or toxic work environment**.

133. Plaintiff was **subjected to a severe, continuous, and highly dangerous hostile work environment based directly on her sex as a female employee** within Defendant's automotive vertical.

134. The hostile work environment culminated on April 29, 2025, during an employer-sponsored, mandatory corporate offsite involving overnight hotel stays in Ohio, when two of Defendant's superior male corporate executives **subjected Plaintiff to a rapid, highly coordinated, and continuous transaction of severe sexual harassment, predatory grooming, and physical victimization**.

135. Specifically, a corporate Vice President targeted Plaintiff, requests her to sit and pulled out a chair to the middle of the floor, executed an unwelcome, non-consensual and language-barrier obscured romantic vocal performance, and concluded by declaring directly to her: Jane, *I love you."*

136. Within seconds of this executive boundary violation, while Plaintiff was still isolated in the chair and processing the trauma of the Vice President's romantic entrapment, her direct male manager, Sanjay Sharma, approached her from behind, tapped her on the shoulder and stated he had "the good stuff," physically separated her from the remaining corporate team members, and surreptitiously administered an unauthorized, undisclosed, and un-tubed high-potency "Knockout Blend" THC-A psychoactive substance.

137. To execute an intentional act of deception and fraudulent physical concealment, the manager physically altered the intoxicating agent prior to provisioning it, removing the manufacturer's factory-twisted hemp lighting tip so that it would structurally mimic a non-intoxicating commercial tobacco cigar-like product, intentionally deceiving a female subordinate into consuming a concealed psychoactive drug.

138. Because an undisclosed intoxicating, mind-altering agent operates as a weapon utilized for drug-facilitated sexual assault (DFSA), a reasonable person in Plaintiff's position would find, and Plaintiff objectively and subjectively did find, that these rapid, sequential, back-to-back executive actions constituted an intolerable, physically threatening, and severe hostile work environment.

139. Defendant is strictly, automatically, and vicariously liable for the creation and toleration of this hostile work environment under federal jurisprudence.

140. Under the ***Faragher-Ellerth*** doctrine, an employer faces automatic liability when the hostile work environment is perpetrated by high-level corporate supervisors such as an active Vice President

and an Associate Vice President who operate as the "alter ego" of the organization, and when the harassment culminates in a tangible adverse employment action, namely, a retaliatory discharge.

141. Defendant completely forfeits any colorable affirmative defense because its Employee Relations and Human Resources departments acted with gross negligence, bad faith, and reckless indifference to Plaintiff's safety and civil rights, including:

a) Explicitly forcing Plaintiff to remain under the direct reporting line, operational control, and performance purview of her admitted assailant for over two months while the internal investigation was pending, leaving her in a continuous state of physical and psychological vulnerability;

b) Actively validating the toxic environment by stripping Plaintiff of her hard-earned corporate "Client Advocacy Award" weeks after the manager's drug confession and transferring the honor directly to the perpetrator, AVP Sanjay Sharma, to celebrate him in public executive decks;

c) Fabricating a sham retail verification narrative to justify accepting a physically and logistically impossible open-shelf "gas station accident" excuse from the supervisor; and

d) Explicitly exposing Plaintiff's highly confidential personal home residential address directly to her admitted assailant on the shared corporate carbon-copy line of her termination email, overriding her explicit safety objections and intensifying her psychological terror.

142. The harassment, grooming, physical deception, corporate validation of the harasser, and weaponization of confidential home data were sufficiently severe and pervasive to fundamentally alter the terms, conditions, and privileges of Plaintiff's employment, rendering her workplace completely hostile, abusive, and physically hazardous.

143. As a direct and proximate result of Defendant's creation, ratification, and bad-faith maintenance of this sexually hostile work environment, Plaintiff has suffered and continues to suffer profound emotional trauma, physical and mental distress, loss of life enjoyments, severe psychological anxiety, and out-of-pocket medical expenses.

**COUNT III**

**Race and Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964**

**(Against Defendant Infosys Limited)**

144. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 143 of this Complaint as if fully set forth herein.

145. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1), makes it an unlawful employment practice for an employer to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment because of such individual's race, color, or sex.

146. Throughout her employment, Plaintiff was subjected to systemic, adverse, and disparate economic and professional treatment by Defendant based directly on her demographic intersection as an African American/Black female. Plaintiff was the only Black female Senior Engagement Manager (Job Level 7A) within her commercial business vertical.

147. Defendant established an exclusionary, discriminatory operational ring that systematically denied Plaintiff the core account foundations, customer ownership, and infrastructure required to succeed, subsequently weaponizing the lack of data to construct a fraudulent paper trail of underperformance.

148. Specifically, Defendant subjected Plaintiff to severe, race- and sex-based disparate treatment and adverse employment actions, including:

a) Systemic 30-Month MCO Blocking: For approximately thirty (30) months following her onboarding, Defendant completely refused to map Plaintiff as the Master Customer Owner (MCO) or portfolio owner for any active account in its database. Defendant's corporate records, including explicit communications from BPHR representative Kratika Gupta, confirm that HR was actively aware that Plaintiff was structurally locked out from generating system-based metrics, resulting in "Zero Actuals" flowing into her Revenue KPIs.

b) Target Bonus Suppression: For the July 13, 2023 payout cycle, despite a baseline contractually designated **target bonus metric of $50,228**, Defendant penalized Plaintiff for the lack of account mappings by issuing her a severely suppressed payout of **$13,059.31—the absolute lowest bonus payout on her entire, all male, direct sales team**.

c) Coordinated Directed Low Ratings: Management personnel, including Senior Manager Rod Crain, explicitly disclosed to Plaintiff and documented to Employee Relations that senior vertical

leadership specifically ordered, directed, and forced negative feedback and suppressed "Needs Improvement" ratings to be targeted *only* at Plaintiff, overriding her actual professional output and business contributions.

d) Subjective Rating Manipulation: During the December 2024 appraisal cycle, when Plaintiff overperformed under adverse conditions to achieve an extraordinary, system-recorded objective target attainment score of 90.68%, AVP Sanjay Sharma explicitly declared the objective numbers to be "incorrect" and manually forced a negative "Needs Improvement" rating by stating the results had to be subjectively "rationalized".

149. While Defendant systematically denied Plaintiff account ownership, client exposure, and equitable bonuses, it routinely provided lucrative new accounts, high-profile executive travel, organizational visibility, and un-rationalized positive ratings to similarly situated Indian male employees who possessed less industry experience and lower job levels.

150. Defendant's human resources and internal compliance structures were fully on notice regarding this systemic demographic profiling, receiving multiple formal written grievances from Plaintiff

tracing her exclusion, marginalization, and the weaponization of the performance review process.

151. Rather than correcting this severe disparate treatment, Defendant ratified it, maintaining the economic suppression of Plaintiff and culminating its race- and sex-based discrimination by terminating her employment under the demonstrably false and pretextual cover-up of poor job performance.

152. As a direct and proximate result of Defendant's willful, intentional, and malicious race and sex discrimination, Plaintiff has suffered and continues to suffer severe economic injury, substantial loss of back pay, front pay, bonus opportunities, and fringe benefits, along with profound loss of professional standing, mental anguish, and severe emotional distress.

**COUNT IV**

**National Origin Discrimination in Violation of Title VII of the Civil Rights Act of 1964**

**(Against Defendant Infosys Limited)**

153. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 152 of this Complaint as if fully set forth herein.

154. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1), makes it an unlawful employment practice for an employer to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment because of such individual's national origin.

155. Throughout her employment, Plaintiff, an American citizen, was subjected to continuous, intentional, and systemic disparate treatment, professional isolation, and exclusion from leadership by Defendant based directly on her national origin.

156. Defendant maintained an unlawful, discriminatory corporate hierarchy within its CoreMFG and automotive practices that disproportionately favored, retained, and promoted Indian nationals while systematically restricting the account assignments, authority, and upward mobility of non-Indian, American employees.

157. On June 27, 2023, during an official performance review and leadership strategy discussion, Plaintiff directly confronted Senior

Vice President and Industry Head Rakesh Babu Gollapalli regarding why she was being stripped of account ownership, barred from leadership portfolios, and excluded from leadership team meetings.

158. In response to Plaintiff's inquiry, Senior Vice President Rakesh Gollapalli provided a rare, direct-evidence admission of national origin animus and systemic exclusion, stating explicitly to Plaintiff: **"Indian culture is very sensitive about who they report to."**

159. This direct statement proves that Defendant intentionally utilized national origin and cultural bias as controlling operational criteria to manage corporate reporting lines, strip American professionals of supervisory authority, and prevent qualified non-Indian managers from leading Indian male subordinates.

160. Driven by this national origin bias, Defendant systematically transferred multi-million dollar account milestones and commercial credits from veteran non-Indian employees to a lower-level Indian national employee, Employee F. This included transferring the *Hitachi Astemo* account won by Employee D, and the *Joyson*, *Visteon*, and *Lear* accounts won by Employee C, directly to Bendi.

161. Furthermore, Defendant routinely stripped Plaintiff of commercial accolades to enrich Bendi's profile, funding his travel opportunities and bestowing corporate awards upon him for events, such as *AutoTech 2024*, that were entirely organized and single-handedly executed by Plaintiff.

162. Defendant's national origin discrimination culminated in the total extraction of Plaintiff's remaining automotive accounts (Rivian and General Motors), which were systematically transitioned to Employee I, a substantially younger Indian national employee with no sales background, immediately prior to and upon Plaintiff's retaliatory termination.

163. As a direct and proximate result of Defendant's willful, pervasive, and intentional national origin discrimination, Plaintiff has suffered and continues to suffer severe economic injury, substantial loss of past and future earnings, loss of substantial corporate benefits, and severe emotional distress.

---

**COUNT V**

**Age Discrimination in Violation of the Age Discrimination in Employment Act (ADEA)**

**(Against Defendant Infosys Limited)**

164. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 163 of this Complaint as if fully set forth herein.

165. The Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 623(a)(1), makes it unlawful for an employer to fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment because of such individual's age. At all times relevant, Plaintiff was over the age of forty (40) and fully protected under the ADEA.

166. Upon the transition of the vertical team to Manager Sanjay Sharma, now Associate Vice President (AVP) Sanjay Sharma on August 1, 2024, Defendant initiated an unlawful, age-biased corporate purge specifically targeting older, veteran employees for negative evaluations and structural separation.

167. The performance evaluation ratings engineered by Manager Sanjay Sharma for the H1 fiscal cycle demonstrate a mathematically uniform, statistically devastating age-based bias curve under the ADEA.

168. Under Manager Sharma's and SVP Rakesh Gollapalli's direct oversight, **100% of the employees aged 58 and older under Sharma's management or purview, were universally hit with negative "Needs Improvement" ratings**—including Plaintiff (58), Employee B (60+), Employee C (60+), Employee D (64+), and Rod Crain (60+) irrespective of their historical records of excellence, revenue generation, or active pipeline management.

169. Conversely, substantially younger employees under Sharma's direct purview including Employee F (51), Employee I (~40), Employee G (~30), and Employee H (30+) were uniformly insulated from negative reviews, systematically retained, and rewarded with account promotions and career advancement.

170. This uniform statistical distribution proves that Defendant abandoned objective performance criteria, utilizing the "Needs Improvement" review process as a discriminatory data-cleansing

mechanism to systematically force older professionals out of the organization.

a) This uniform targeting of professionals aged 58 and older directly reflects an institutional national origin bias and corporate animus rooted within Defendant's foreign parent-company infrastructure. In the private corporate sector of India, where Defendant is headquartered and where its senior executives are culturally trained, the standard, universally accepted baseline for mandatory employee retirement is strictly fifty-eight (58) to sixty (60) years of age. By permitting Sanjay Sharma and leadership to apply these foreign, extra-jurisdictional retirement baselines to its domestic workforce, Defendant systematically imported an unwritten, illegal age cap **to purge veteran American assets**, directly violating the statutory mandates of the ADEA.

b) Defendant's enforcement of an extra-judicial age cap is explicitly documented through its contemporaneous treatment of other senior members on Plaintiff's immediate sales vertical. Specifically, coworker and witness Employee C, a high-performing sales asset over the age of fifty-eight (58), was

explicitly informed by corporate travel management that because he had reached the age of 58, he was no longer permitted standard travel clearance and would require an extraordinary corporate 'exception' to travel overseas or receive standard corporate expense reimbursements.

c) This blatant corporate restriction forced said coworker to formally remind Defendant, in writing, of his status as a United States citizen fully protected under domestic employment laws. This operational occurrence provides direct, objective evidence that Defendant maintains a systemic, structurally enforced policy of applying restrictive, age-biased penalties to employees the exact moment they cross the age-58 threshold, perfectly mirroring the pretextual rating manipulation and sudden termination executed against Plaintiff.

171. Defendant further demonstrated a reckless disregard for the ADEA by completely bypassing its own standard progressive discipline policies, refusing to provide Plaintiff with a Performance Improvement Plan (PIP), formal coaching, or a corrective action plan prior to discharge, despite her presenting substantiated electronic proof that she met or exceeded her performance targets.

172. Defendant's stated performance-based justification for discharging Plaintiff was a pretextual cover-up for systemic age discrimination, as conclusively evidenced by her previous 90.68% target attainment score receiving a "Needs Improvement" rating, her selection for a major organizational award 24 days prior to firing, and the retention of substantially younger comparators to absorb her accounts and the ***high number*** of individuals that have received "Needs Improvement" ratings that still remain with the company.

173. As a direct and proximate result of Defendant's willful, malicious, and intentional age discrimination, Plaintiff has suffered and continues to suffer severe economic injury, loss of career longevity, loss of back pay and front pay, loss of substantial pension and health benefits, mental anguish, and severe emotional distress.

**COUNT VI**

**Harassment and Retaliation in Violation of the Michigan Elliott-Larsen Civil Rights Act (ELCRA)**

**(Against Defendant Infosys Limited, Defendant Sanjay Sharma, and Defendant Rakesh Babu Gollapalli)**

174. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 173 of this Complaint as if fully set forth herein.

175. The Michigan Elliott-Larsen Civil Rights Act (ELCRA), MCL § 37.2101 *et seq.*, strictly prohibits an employer from discriminating, harassing, or retaliating against an employee regarding the terms, conditions, privileges, or opportunities of employment based on sex, race, age, or national origin.

176. Unlike federal law under Title VII, Michigan's ELCRA recognizes **individual, personal supervisor liability**. Individuals who exercise corporate supervisory oversight, direct account assignments, manipulate performance metrics, or execute termination directives qualify as "employers" under the statute and are held jointly and severally liable alongside the corporate entity for money damages.

177. Throughout her employment, Plaintiff was systematically subjected to an abusive, discriminatory, and hostile work environment driven by race, sex, age, and national origin, directly orchestrated by Defendant Rakesh Babu Gollapalli and Defendant Sanjay Sharma, and corporate-ratified by Defendant Infosys Limited.

178. Defendant Rakesh Babu Gollapalli engaged in direct national origin and gender discrimination in explicit violation of the ELCRA by maintaining a hostile, exclusionary leadership structure, executing punitive account extractions, and explicitly stating that **"Indian culture is very sensitive about who they report to"** to justify blocking Plaintiff from senior executive account management over Indian male subordinates.

179. Defendant Sanjay Sharma engaged in egregious sex harassment, physical victimization, and age discrimination in explicit violation of the ELCRA by:

a) Surreptitiously isolating, and administering an intentionally altered, flattened lighting end, high-potency "Knockout Blend" psychoactive intoxicating agent to a female subordinate during an overnight, employer-sponsored hotel stay;

b) Engineering a statistically devastating age-bias curve that universally hit **100% of his team members aged 58** and older with negative "Needs Improvement" ratings to force senior professionals out of the organization; and

c) Executing the ultimate adverse action of a **retaliatory termination just eleven (11) days after the internal compliance probe closed**.

180. Defendant Infosys Limited is vicariously and strictly liable for the actions of its executive agents under the ELCRA. The company maintained a severe hostile work environment by forcing a verified victim of physical executive grooming to remain under the direct reporting line of her admitted assailant for over two months during an active investigation, stripping Plaintiff of a hard-earned performance award to give it to the perpetrator, and explicitly publishing Plaintiff's personal home residential address directly to her attacker on the shared line of her termination email.

181. Under Michigan law, MCL § 37.2701, it is an absolute violation to retaliate or discriminate against a person because the person has opposed a violation of the Act or made a charge, filed a complaint, or participated in an investigation under the ELCRA.

182. Defendants collectively executed a swift, malicious campaign of retaliatory discharge against Plaintiff in direct response to her reporting executive misconduct, participating in the Employee Relations investigation, and filing her formal performance review appeal.

183. Defendants' stated "performance" justification is entirely pretextual, as Plaintiff possessed high-value educational credentials (including executive certifications from Stanford University and Northwestern Kellogg) and system-recorded target attainment scores reaching up to 125%.

184. Unlike the statutory constraints embedded within federal Title VII frameworks, **Michigan's ELCRA contains no statutory caps on financial compensation or compensatory damages**.

185. As a direct and proximate result of the Defendants' collective, willful, and malicious violations of the ELCRA, Plaintiff has suffered and continues to suffer severe economic injury, total loss of professional livelihood, profound loss of physical security, extreme mental anguish, secondary physical trauma (including severe migraine spasms), anxiety, and deep emotional distress.

186. Plaintiff demands judgment against Defendant Infosys Limited, Defendant Sanjay Sharma, and Defendant Rakesh Babu Gollapalli, jointly and severally, for uncapped compensatory damages, back pay, front pay, emotional distress, and punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against Defendants, **Infosys Limited, Sanjay Sharma, and Rakesh Babu Gollapalli**, jointly and severally, granting the following legal, equitable, and extraordinary relief:

A. A declaratory judgment that the acts, practices, omissions, and policies of the Defendants complained of herein constitute systematic violations of **Title VII of the Civil Rights Act of 1964**, the **Age Discrimination in Employment Act (ADEA)**, and the **Michigan Elliott-Larsen Civil Rights Act (ELCRA)**;

B. An Order declaring any pre-dispute mandatory arbitration agreements or class/joint-action waivers executed between Plaintiff and Defendant Infosys Limited to be completely **void, invalid, and unenforceable** under the **Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (EFAA), 9 U.S.C. §§ 401–402**, because this dispute directly originates from a substantiated sexual harassment and physical victimization transaction;

C. An award of **full back pay**, inclusive of all suppressed performance bonuses, lost commissions, and matching retirement/401(k) fringe benefit contributions that Plaintiff would have earned but for the Defendants'

discriminatory, selective enforcement, and retaliatory practices, calculated from the date of the unlawful adverse actions through the date of judgment, plus pre-judgment interest;

D. An award of **front pay** and front-line benefits to compensate Plaintiff for the loss of future earnings and career longevity resulting from her retaliatory discharge and subsequent industry blacklisting;

E. An award of **uncapped compensatory damages** under Michigan's ELCRA to compensate Plaintiff for her profound emotional distress, severe mental anguish, ongoing psychological trauma, and physical suffering (including severe migraine spasms) directly inflicted by the Defendants' toxic, hazardous, and physically threatening work environment, their weaponization of internal compliance tracking, and their malicious exposure of her confidential home residential address to her admitted assailant;

F. An award of **punitive and exemplary damages** under Title VII and federal civil rights statutes, in an amount to be determined at trial, as a direct result of Defendant Infosys Limited's malicious, reckless indifference to Plaintiff's federally protected civil rights, safety, and physical autonomy;

G. An award of out-of-pocket expenses, including medical, therapeutic, and investigative costs incurred as a direct consequence of the physical grooming transaction, internal bad-faith probe, and retaliatory actions detailed herein;

H. **ALTERNATIVE MOTION FOR TRANSFERS PURSUANT TO 28 U.S.C. § 1406:** In the event that this Court determines that subject-matter jurisdiction or judicial venue is improper or invalid within the Eastern District of Michigan due to the multi-state nature of the remote field sales metrics or the underlying physical incident locations, Plaintiff respectfully and explicitly **requests that this Court transfer this entire action to the appropriate and valid federal judicial district** (such as the Southern District of Ohio or the Northern District of Texas) in the interests of justice and pursuant to **28 U.S.C. § 1406(a)** or **28 U.S.C. § 1404(a)**, rather than dismissing any portion of Plaintiff's claims; and

I. Such other, further, equitable, and proper relief as this Court deems necessary, just, and appropriate to make the Plaintiff whole.

---

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby formally and unconditionally **demands a trial by jury** on all claims, issues, and counts in this action that are triable of right by a jury.

---

Dated: September 22, 2026

Respectfully submitted,

---

**JANE DOE**, Plaintiff Pro Se
P. O. Box 402
Southfield, MI 48037-9913
janedoe.litigation@proton.me
(947) 254-0830
(True legal name and primary residence submitted under seal)

**Jane Doe v. Infosys Limited, et al. | Case No.**
**Plaintiff's Index of Exhibits**

| Exhibit Number | Title / Document Description | Relevant Claims / Context |
|---|---|---|
| **Exhibit 1** | Texas Workforce Commission Unemployment Benefit Determination | Corporate shifting explanations: Defeats "willful misconduct" allegations; ruled fully in Plaintiff's favor. |
| **Exhibit 2** | Infosys Job Description – Work Location Job Details | Documentation and Evidence of work location and state/province/region identified as Detroit and Michigan in Sales Role Job Description |
| **Exhibit 3** | Rakesh Gollapalli (VP, now SVP, Infosys Limited) – Response to Toyota Complaints | Evidence of supervisory notice and response regarding systemic Toyota account issues and marginalization. |
| **Exhibit 4** | Sukanya Bose, BPHR – Initial Email re: Toyota Issues and Concerns (May 18, 2022) | Internal HR notice demonstrating long-standing complaints of disparate treatment and task demotion on the Toyota account. |
| **Exhibit 5** | Sukanya Bose, BPHR – re: Toyota and Transition to | Contemporaneous HR correspondence regarding |

| Exhibit Number | Title / Document Description | Relevant Claims / Context |
|---|---|---|
| | New Portfolio (June 2, 2022) | account removal and portfolio transitions. |
| **Exhibit 6** | Letter to Sukanya Bose, BPHR – re: Transition to New Portfolio (June 3, 2025) | Formal escalation regarding ongoing 30-month MCO lockout, account mapping failures, and portfolio disputes. |
| **Exhibit 7** | Drug Facilitated Sexual Assault (DFSA) Agent – THC Product Packaging | Photographic evidence of manufacturer's packaging proving factory-twisted hemp lighting tip, establishing intentional modification and fraudulent concealment. |
| **Exhibit 8** | Automotive Team – Comparators Pipeline vs. Jane Doe Pipeline | Comparative commercial data showing Plaintiff's superior pipeline performance against male peers – Plaintiff ($7M), Employee C ($9.3M), Employee F ($4.8M) and Employee NAO ($3M) despite receiving no bonus payout and "Needs Improvement" rating that led to termination based on corporate policy. |
| **Exhibit 9** | Kratika Gupta, BPHR Email – Performance | Documented corporate system record showing the engineered |

| Exhibit Number | Title / Document Description | Relevant Claims / Context |
|---|---|---|
| | Rating Revenue KPI Showing as Zero Actuals, No Account Assignment | "Zero Actuals" tracking despite active commercial pipeline production. |
| **Exhibit 10** | AutoTech Detroit – Praise from Leadership – Rakesh Gollapalli | Direct supervisory commendation and recognition of high-level industry performance. |
| **Exhibit 11** | AutoTech Detroit – Praise from Leadership – Dewole Aradeon | Executive recognition validating Plaintiff's commercial contributions and leadership presence. |
| **Exhibit 12** | Performance Praise – Charles Salameh, Infosys SVP | Executive written evaluation confirming Plaintiff's commercial output was "better than most," disproving performance pretext. |
| **Exhibit 13** | Client Advocacy Award – Urgent Email on August 1, 2025 | Documentation of marketing-approved award nomination 24 days prior to discharge, subsequently stripped and transferred to assailant Sanjay Sharma. |
| **Exhibit 14** | Infosys Mutual Arbitration | The underlying corporate mandatory arbitration agreement |

| Exhibit Number | Title / Document Description | Relevant Claims / Context |
|---|---|---|
| | Agreement – VIII, Place of Arbitration (County) | and Place of Arbitration subject to complete statutory invalidation under the EFAA (9 U.S.C. §§ 401–402) and *Bruce v. Adams & Reese*. |
| **Exhibit 15** | Account on a Page – Activity from October 1, 2024, to August 25, 2025 | Comprehensive activity logs proving continuous commercial engagement, pipeline progression, and client management leading directly up to termination. |
| **Exhibit 16** | Email – re: Plaintiff's Residential Address Revealed to Sanjay Sharma by HR | Direct proof of post-investigation retaliatory exposure of Plaintiff's confidential home residential address to the admitted perpetrator. |
| **Exhibit 17** | Infosys Offer Letter | Direct proof of Plaintiff's residence at time of Application to Job and Acceptance of Job. |
| **Exhibit 18** | Equal Employment Opportunity Commission (EEOC) – Notice of Right to Sue Letter issued on June 29, 2026. | Letter advising Plaintiff of her Determination and Notice of Rights including her 90-day notice to file. |

| Exhibit Number | Title / Document Description | Relevant Claims / Context |
|---|---|---|
| **Exhibit 19** | Public Corporate Governance Declarations on Harassment Policies (*The Economic Times*, July 3, 2025 & April 15, 2026) | Demonstrates pretext, bad-faith contradiction of "zero-tolerance" and "speak-up" policies, and disparate treatment in executive discipline. |
| **Exhibit 20** | Infosys Separation Letter | Separation Letter outlining reason for separation: Performance during the last appraisal cycle ... in line with Infosys Policies and Processes. |

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. __________________**

**INFOSYS LIMITED,** **Hon. ______________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 1** | Texas Workforce Commission Unemployment Benefit Determination |

UI Support & Customer Service
TEXAS WORKFORCE COMMISSION
PO BOX 149346
AUSTIN TX 78714-9346

DETERMINATION ON PAYMENT OF UNEMPLOYMENT BENEFITS
Date Mailed: October 14, 2025

Jane Doe

Social Security Number: [redacted]
Employer: INFOSYS TECHNOLOGIES
As:

Employer Account No: 02-200045-4
All dates are shown in month-day-year order.

**Decision**

Issue: Separation from Work
Decision: We can pay you benefits, if you meet all other weekly requirements such as being able, available and actively searching for work.
Reason for Decision: Our investigation found that some of your actions on the job may have been considered misconduct. However, the incident your employer fired you for was not considered misconduct connected with the work.
Law Reference: Section 207.044 of the Texas Unemployment Compensation Act.

**Understanding your Decision**

If you receive a decision that says, "we cannot pay you benefits," it means there is a problem with your claim EVEN IF you have received other decisions for the same period that say, "we can pay you benefits." If even one decision for the same period says we cannot pay, you will not receive an unemployment payment for that period.
To resolve issues on decisions you receive:
1. Follow instructions on the notice(s); call the Tele-Center at 800-939-6631 if you have questions;
2. If the instructions tell you to "Report," call the Tele-Center at once;
3. If you disagree with a decision, file an appeal. Appeal each decision separately by the appeal deadline. If you fax your appeal, keep a confirmation sheet.

Your employer can appeal TWC's decision to pay benefits. TWC will notify you of any appeal hearing. If you do not participate, you may lose your benefits and have to repay benefits you received.

**Determination of Potential Chargeback for the Employer**

We will charge your former employer's account if we pay you benefits.

**If You Disagree with this Decision**

If you disagree with this decision, you may appeal. Submit your appeal by mail, fax, online, or in person at any Texas Workforce Solutions office, on or before 10-28-25 .
TWC will use the postmark date, or the date we receive the fax or online form, to determine whether you submitted your appeal on time. If you appeal by fax, you should keep your fax confirmation as proof you sent it. Please include a copy of this determination notice with your appeals correspondence.
If you receive multiple determination notices, you must appeal each determination separately.

Mail the appeal to:

Appeal Tribunal
Texas Workforce Commission
101 E. 15th Street
Austin, TX 78778-0002
Or fax to (512) 475-1135

You may appeal by submitting TWC's online appeal form. Go to www.texasworkforce.org/uiappeal

Case No.: 2
Claim ID.: 09-21-25
Claim Date: 09-21-25
HEARING IMPAIRED CLIENTS CALL 711 for RELAY TEXAS

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. __________________**

**INFOSYS LIMITED,** **Hon. ______________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 2** | Infosys Job Description – Work Location Job Details |

Infosys Careers ? (https://www.infosys.com/careers/) Explore Opportunities ? (https://digitalcareers.infosys.com/infosys/global-careers) Jobs in USA ?

(https://digitalcareers.infosys.com/infosys/global-careers?location=USA) Senior Sales Manager - Automotive

Senior Sales Manager - Automotive

Apply now (https://digitalcareers.infosys.com/infosys/global-careers/apply-senior-sales-manager-automotive/568805)

Infosys is seeking a highly motivated and results-driven Senior Sales Manager to drive net-new business in Automotive for the Manufacturing vertical. This individual will be responsible for identifying, engaging, and closing strategic and large deals with the manufacturing enterprises. The ideal candidate is a proven "hunter" with a strong network, and expert in shaping and selling IT solutions and services to Industrial manufactures, Automotive, Aerospace & Defense, or other asset heavy industry industries.

The Senior Sales Manager will be growing net new Automotive business at rapid pace and achieving new logo acquisition targets. This position requires a comprehensive understanding of the market, competition and partner ecosystem to develop compelling sales strategies. This person also needs to be a big picture thinker and has ability to work with the solutioning teams to shape up the client value proposition. The "hunter" is motivated to acquire new logos, drive pipeline velocity and close contracts.

Are you looking to take your sales career to the newer heights? This is a career opportunity for top sales talent to be part of the team innovating Manufacturing of the Future. So, don't wait, apply today!

About Infosys Manufacturing

Manufacturers today face rapid shifts driven by evolving customer expectations, global supply dynamics, and the accelerating pace of technological change. These forces are prompting enterprises to rethink their operations, strengthen resilience, and embrace intelligent, automated, and data & AI-led ways of working. To stay competitive, organizations must safeguard their value chains from disruptions, diversify product portfolios, and reimagine cost structures for sustainable growth – all while continuing to uphold world class product and service quality.

The Infosys Manufacturing practice helps enterprises unlock new revenue streams and achieve operational excellence through automation, AI-driven insights, and digital engineering.

We deploy advanced data solutions that enhance preparedness for challenges such as order variability, equipment downtime, and resource constraints. Our business continuity frameworks help organizations manage change, steer incident response, and maintain seamless operations.

To learn more about Infosys and see our perspectives in action, please visit us at www.infosys.com (http://www.infosys.com) Role Responsibilities

- Identify, pursue, and close new business opportunities
- Serve as the primary market-facing representative for Infosys, positioning the company as a trusted advisor and strategic partner
- Build and nurture executive-level relationships with key decision-makers and sponsors
- Leverage the full Infosys portfolio—including Application Services, Data & Analytics, Cloud & Infrastructure, Security, Digital, IoT, Business Process Services etc - to develop solutions aligned to client business needs
- Collaborate closely with internal stakeholders across practices, verticals, and global delivery teams to drive deal pursuit and execution
- Lead opportunity qualification, proposal development, and executive-level presentations
- Act as a key contributor to the growth and expansion of Infosys' global service offerings Required Qualifications
- Bachelor's degree or foreign equivalent required from an accredited institution. Will also consider three years of progressive experience in the specialty in lieu of every year of education and 15+ years of experience, with strong sales experience in services industry
- Develop and execute sales growth strategies
- Track record of building relationship with CXOs of leading automotive organizations
- Expert in full sales lifecycle management from prospecting through contract closure
- Hands-on experience with proposal creation and leading proposal presentations
- Manage complex pursuits and multi-service line opportunities
- Demonstrated ability in Industry thought leadership and domain led selling
- Leverage hyperscalers and software partners ecosystem

- Strong leadership, interpersonal, communication and presentation skills
- Represent Infosys at industry conferences, client events, and executive forums
- Candidates authorized to work for any employer in the US without employer-based visa sponsorship are welcome to apply. Infosys is unable to provide immigration sponsorship for this role at this time.

Preferred Qualifications

- Consistent, well-documented track record of achieving or exceeding annual sales quotas
- Demonstrated success generating organic revenue growth through structured prospecting and outbound sales techniques
- Recent experience selling consulting or transformation-led engagements.
- Well-established network within the automotive sector and IT services industry
- Experience with software or services contract negotiation
- Comfort operating in a global, matrixed organization and service delivery environment
- Experience with competitive analysis, competitor mapping, and SWOT analysis.

Benefits

Along with competitive pay, as a full-time Infosys employee you are also eligible for the following benefits:

- Medical/Dental/Vision/Life Insurance
- Long-term/Short-term Disability
- Health and Dependent Care Reimbursement Accounts
- Insurance (Accident, Critical Illness , Hospital Indemnity, Legal)
- 401(k) plan and contributions dependent on salary level
- Paid holidays plus Paid Time Off

About Us

Infosys is a global leader in next-generation digital services and consulting. We enable clients in more than 50 countries to navigate their digital transformation. With over four decades of experience in managing the systems and workings of global enterprises, we expertly steer our clients through their digital journey. We do it by enabling the enterprise with an AI-powered

core that helps prioritize the execution of change. We also empower the business with agile digital at scale to deliver unprecedented levels of performance and customer delight. Our always-on learning agenda drives their continuous improvement through building and transferring digital skills, expertise, and ideas from our innovation ecosystem.

EEO

Infosys provides equal employment opportunities to applicants and employees without regard to race; color; sex; gender identity; sexual orientation; religious practices and observances; national origin; pregnancy, childbirth, or related medical conditions; status as a protected veteran or spouse/family member of a protected veteran; or disability.

Job details Job Role

Business Development Manager

Work Location Detroit, MI

State / Region / Province

Michigan

Country USA

Skills

Sales|Domain|Sales Execution

Domain Global Markets

Interest Group Infosys Limited

Company ITL USA

Requisition ID 152582BR

https://digitalcareers.infosys.com/global-careers/company-job/description/reqid/152582BR

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ________________**

**INFOSYS LIMITED,** **Hon. ____________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 3** | Rakesh Gollapalli (VP, now SVP, Infosys Limited) – Response to Toyota Complaints |


Internal \ Companywide usage

RE: Transition of portfolio

JD Jane Doe
To Rakesh Babu Gollapalli 5/16/2022

Jane Doe

**From:** Rakesh Babu Gollapalli
<Rakesh_Gollapalli@infosys.com>
**Sent:** Friday, May 13, 2022 2:10 PM
**To:** Jane Doe
**Cc:** Rajiv Kumar <rajiv.kumar@infosys.com>; Kartikeya Bisht
<KarthikeyaB@infosys.com>
**Subject:** Transition of portfolio

Rajiv,

Please Transition Jane into your team.

Jane please reach out to Rajiv. You need to be more proactive and ensure you are working on active client facing activities and growing accounts.

Karthik – we spoke.

to date. Connected to: Microsoft Exchange 100%

10:43 PM
2/22/2024

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ________________**

**INFOSYS LIMITED,** **Hon. ____________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 4** | Sukanya Bose, BPHR – Initial Email re: Toyota Issues and Concerns (May 18, 2022) |

Internal \ Companywide usage

Jane Doe

Wed 5/18/2022 10:44 AM

Sukanya:

Thank you for the conversation this morning regarding my concerns with my current role within the CORE-Mfg team.
As mentioned, I am concerned with how my conversation with Rakesh has led to me being transitioned into another team.
I am concerned that after reaching out to Rakesh regarding my role and where I am after one (1) year on the time that had some significant issues that I wanted addressed:

I have been excluded from the Account, key opportunities and initiatives currently associated and being pursued by the Account team
I have not met anyone from the Client team
I have not been included on any live opportunities in the pipeline
I was marginalized throughout the TCI AMS proposal pursuit
And, had the strategy, content and approach I recommended been followed – there was a greater chance that we would have won given the Client's feedback outline the exact issues my strategy and content served to address – emails and content (available)
We did not have a recap with Rakesh despite my requesting a loss recap. Particularly, given I was told this would be my account to lead. (email available)
I was excluded from the [illegible] TCI Adobe AEM after attending more meetings for this proposal than anyone else on the Account team
I was not included in the [illegible] QBR despite asking for the date and meeting invite (email available)
I was not invited to the TFS Virtual meeting despite asking to be included
I was not included in the Toyota Account team planning sessions after the in-person meeting in Dallas in September.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ________________**

**INFOSYS LIMITED,** **Hon. ____________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 5** | Sukanya Bose, BPHR – re: Toyota and Transition to New Portfolio (June 2, 2022) |



Natalie McCants - Follow up - Message (HTML)

Internal \ Companywide usage

Jane Doe

Thu 6/2/2022 1:51 PM

Sukanya

Thank you for the conversation yesterday regarding my concerns with my current role within the CORE-Mfg team. I am sending a wrap-up of our discussion
As mentioned, I am concerned with how my conversation with Rakesh has led to me being transitioned into another team. I am concerned that after reaching out to Rakesh regarding my role and where I am after one (1) year on the team that had some significant issues that I wanted addressed:

I was excluded from the Account, key opportunities and initiatives currently associated and being pursued by the Toyota Account team

- I have not met anyone from the Client team
- I have not been included on any live opportunities in the pipeline
- I was marginalized throughout the TCI AMS proposal pursuit
  - And, had the strategy, content and approach I recommended been followed – there was a greater chance that we would have won given the Client's feedback outlining the exact reasons we were not down-selected for the opportunity (emails and content available to support)
  - We did not have a recap with Rakesh despite my requesting a loss recap. Particularly, given I was told this would be my account to lead. (email available)
  - I was attacked time and time again by Gaurav Agarwal during our planning sessions for the TCI AMS RFP to the point where I was fed up with being demeaned, marginalized and relegated to administrative work on a project I was identified to lead. And would have led quite successfully to a better conclusion had my strategy and approach been allowed to be recognized.
  - I was, again, attacked by Gaurav Agarwal during a team meeting where I agreed with several others (specifically, Abrahim Thomas) regarding the need for more interaction with the Practice areas to be understand the "Why Infosys" differentiators, approach and methodology for those practice areas. This happened on a team call in February and I was singled out and

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. __________________**

**INFOSYS LIMITED,** **Hon. ______________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 6** | Letter to Sukanya Bose, BPHR – re: Transition to New Portfolio (June 3, 2025) |

## Letter to Sukanya Bose, Infosys BPHR (Automotive) – June 3, 2022

I apologize for resending this message. However, I had to clean up a few items and reinforce some areas of the prior mail message.

As mentioned, I am concerned with how my conversation with Rakesh has led to me being transitioned into another team. I am concerned that after reaching out to Rakesh regarding my role and where I am after one (1) year on the team that my concerns have been met with my removal from the Toyota Account team and transitioning to a different account and role:

Specifically for the past year I was consistently and systematically excluded from the Toyota Account, key Toyota opportunities and key initiatives currently associated and being pursued by the Toyota Account team:

- I have not met ANYONE from the Client side of the account
  - I was never introduced to the Client
  - I never attended any Client facing meetings
- I was not introduced to the Infosys internal team supporting the account
  - I introduced myself to the operational team. I was never formally introduced to any of the account team.
- I was not assigned to the account as a MCO lead for the account
- I have not been included on any live opportunities in the pipeline
- I was marginalized throughout the TCI AMS proposal pursuit and then, excluded from the TCI Adobe AEM RFP response
  - And, had the strategy, content and approach I recommended for the TCI AMS RFP been followed – there was a greater chance that we would have won given the Client's feedback outlining the exact reasons we were not down-selected for the opportunity (emails and content available to support my position)
  - We did not have a WIN/LOSS recap with Rakesh despite my requesting a recap. Particularly, given I was told this would be my account to lead. (emails available to support my position)
  - I was attacked time and time again by Gaurav Agarwal during our planning sessions for the TCI AMS RFP to the point where I was fed up with being demeaned, marginalized and relegated to administrative work on a project I was identified to lead. Again, had I been allowed to lead, I would have led quite successfully to a better conclusion had my strategy and approach been allowed to be recognized.
  - I was excluded from the Orals for TCI Adobe AEM after attending more meetings for this proposal than anyone else on the Account team including Gaurav and Kartik. I attended the 3am/4am Functional and Practice specific support calls until I was eventually removed from the invites for the final prep calls.
- I was not included in the Toyota QBR despite asking for the date and meeting invite (email available)
- I was not invited to the TFS Virtual meeting despite asking to be included
- I was not included in the Toyota Account team planning sessions after the in-person Dallas meeting we held for Account planning in September 2021.
- I was attacked again by Gaurav Agarwal during one of Rakesh Thursday team meeting where I agreed with several others on the team (specifically, Abrahim Thomas) regarding the need for more interaction with the Practice areas to better understand the "Why Infosys" differentiators, approach and methodology for those practice areas. This happened on a team call in February and I was singled out and told by Gaurav that I needed to find this information on my own. Even though I

have done just that: evidenced by the number of LEX classes, badges and sessions attended to get myself up to speed on Infosys.

- What I expected from my Toyota account team members was any additional support and answers to questions not handholding. I am very capable of seeking information on my own. I did not need to be told to do that by my peers or my manager. I find it unacceptable that a peer should feel comfortable speaking to me or anyone in this manner. We are teammates and teammates should support and help each other not attack and demean.

Despite all of this, I was extremely proactive in reaching out to others to provide assistance where my own team would not assist or support:

- Met with Elizabeth Rachin to walkthrough RaR, AR180 and operational meetings that my Toyota team did not include me in.
- I reached out to Brahma Pandey for support in obtaining slideware and access to K-MAN when my teammates (Kartik and Gaurav) did not provide any support in assisting with processes, operational understanding and day-to-day activities that would normally be associated with an existing customer and onboarding a teammate in a key role such as mine to the team.
- Even though my own account teammates did not support, on at least two (2) occasions other Infosys employees witnessed the behavior of my teammates and reach out to me
  - One of my team members from CORE-Mfg reached out to me after the February meeting where I was attacked by Gaurav to understand what was going on and how could they help.
  - During the Toyota Supplier Diversity meetings, I received a similar dismissing interaction with Kartik that was witnessed by an Infosys employee who asked what is going on.

It was identified by Rakesh that I needed to be more proactive which infers that I had not been despite:

- The number of emails requesting time with Kartik dating back to before my start date.
- Daily/Weekly Sales team calls were cancelled on a regular basis and eventually eliminated.
- On the few occasions where we held the sales team calls, I was dismissed after 5 minutes and Gaurav and Kartik stayed on to discuss other items that I was not included as a part of the conversation.

It seems that I am the only one on this team who has had to navigate everything on my own. It seems that I am the only one who needs to be responsive and that my teammates have not one ounce of responsibility to also be good stewards towards me.

***Again, why was I never introduced to the Client or the team. Why am I, a JL7A, not being treated as a peer and being treated as the administrative secretary for Kartik and Gaurav? There were times when it seemed that I was reporting to Gaurav as my boss (supporting emails available of Gaurav's demeaning tone of his messages to me). Kartik simply ignored me and chose to exclude me unless it had something to do with Toyota's Minority Supplier initiatives and even then, I was asked to be the administrative secretary (emails available to support this statement) to him and Gaurav.***

All of the above indicates that it was not expected that I would remain on the Toyota Account team and that the intent was to ensure that I would not remain on the account team.

**Number One Issue:**

- Never introduced to the Client. Despite all my request I have never been introduced to the Client.
- I never received the contract or any meaningful inclusion in any activities associated with the account.
    - QBR
    - Operations meetings (internal)
    - Client meetings

I have not felt safe or supported. Once it was allowed for me to be singled out and attacked during that February meeting, I did not feel comfortable mentioning any need to Rakesh because it seemed this form of attack was acceptable.

When I scheduled time with Rakesh, I hoped the behavior towards me by Kartik and Gaurav would be addressed for change in behavior towards me. I expected there would be a conversation to discuss the behavior I have endured during this time with Infosys. I have done everything I was supposed to do to ensure a better outcome with this team. Instead of this conversation to address how the Toyota account team will work together going forward and how I would be integrated into the team, I am now being pushed away from the specific direction I expected as my reason for joining Infosys and being blamed for the bad behavior of others towards me.

I did not come here to be mistreated, marginalized, demeaned and attacked for proactively doing the job I was hired to do. Despite all of my efforts, my performance is being questioned, my financial opportunities have been lessened and the people who had a hand in excluding me from the opportunities I am more than capable of providing are being rewarded with my removal from the account. This is despite all of the evidence that this has nothing to do with my work, capabilities or what I attempted to provide as a leader and employee.

I am disappointed with the handling, with the treatment of me and with the response to my concerns. I have had to step back and process what has happened to me and is still happening to me. The evidence that this is not about me, my behavior, any lack of proactive request to be included is present in the current assignment under Rajiv Kumar where I have received the minimum support that a leader should show to a new teammate and peer.

- I have been introduced to the team. I have received the contract.
- I have reached out in the same way as I did with Kartik and Gaurav to my current teammates. My proactive interactions have been met with the response I should have received from Kartik Bisht and Gaurav Agarwal that I did not receive from either.

My first request is that I don't want to receive another message about what I need to do or the inference that I didn't do something. I did what I was supposed to do and more. I felt like I was begging to be included. I tried not to believe what was happening was happening to me. I need the messages about my performance to reflect that I performed to the best of my ability under terrible conditions.

My second request is that I will need to initiate a more formal process to address these issues given the continued marginalizing of my position and my performance. I will always come in as a professional leader. I know what I have attempted to do and I now know what was being done to me and why. It now needs to be recognized what I have had to endure under Mr. Bisht and Mr. Agarwal. Unfortunately, I have not received any form of support in recognizing the untenable position I was under during my time working with Kartik Bisht and Gaurav Agarwal. I have tried everything possible to have a conversation and resolution that

was fair to me. It hasn't happened. I will not be the only one held accountable for these circumstances. I was seeking a conversation with all parties. The conversation should not always be about me and what I need to do. I know exactly what I need to do and I did. Now I am also doing exactly what I need to do because others have not done what they should do where I am concerned. Passing me off to another team was disrespectful and once again I am being marginalized.

My background is Automotive. I have purposely mapped this portion of my career towards Automotive-focused career pursuits. Transitioning me away from that role is a punishment. It is a punishment for someone else's bad behavior towards me that is now being made to be about me and my performance. That is unacceptable.

I find the resolution and the messaging from management to be unacceptable given the evidence I have of the behavior I endured and how I attempted to work around this behavior to not be in this position.

**Email evidence**

Reached out requesting time to discuss account with invites

6-25-21
8-23-21
8-19-21 – I was the first to respond to request for in person meeting in Dallas for account planning

June 24, 2021 email from Rakesh Gollapalli

Kartik and Hanuman

Please finalize the goals fo Jane nd help her update the same in the system
Also you and Hanuman please start orienting Jane account and start introducing her to various client stakeholders

August 10, 2021, email

Auto Account teams
Toyota account Jane and Kartik

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ________________**

**INFOSYS LIMITED,** **Hon. ____________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 7** | Drug Facilitated Sexual Assault (DFSA) Agent – THC Product Packaging |


ALIEN
EXOTICS
21+
THC-A
PREMIUM PRE-ROLL
JELLY DONUT
INDICA
CALIFORNIA
—GROWN—
ORGANICALLY
INDOOR
FLOWER
KNOCKOUT BLEND
ALIEN
35% THC-A
ALIEN
35% THC-A
2 PRE-ROLLS
3 GRAMS TOTAL
KEPT FRESH IN TUBES
EXOTIC HEMP WHOLE FLOWER


ALIEN
INGREDIENTS:
100% Organic Fresh Ground Buds
No Additives, No Cutting Agents, No Pesticides
3rd Party Lab Tested For Quality and Legal Compliance
Federal Farm Bill Compliant, 100 % hemp derived - contains Less Than 0.3% D9-THC
If you're sensitive to THC do not use this product.
WARNING: Keep out of reach of children. Not intended for use by anyone under 21 years of age. May cause drowsiness.
Do not operate a vehicle or heavy equipment when taking this product. Do not use if you are pregnant, breastfeeding, have or suspect a medical condition, or are taking any medications. Consult your physician before use. Do not take this product if you are subject to drug testing.
JELLY DONUT THC-A
WARNING:
Cancer or Reproductive Harm P65Warnings.ca.gov
MANUFACTURED FOR:
EXOTICS PROVISION
Huston, TX 77036
aliendeltaeight.com
* These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.
62221 57874
ALIEN
35% THC-A
Batch # A1THCA09
Expires 12/26
HEFTY
STRONGER SEAL

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ________________**

**INFOSYS LIMITED,** **Hon. ____________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 8** | Automotive Team – Comparators Pipeline vs. Jane Doe Pipeline (4/15/2025) – Plaintiff ($7M), Employee C ($9.3M), Employee F ($4.8M) and Employee NAO ($3M) |


New Opportunities Auto_A&D

https://infosystechnologiesnam.sharepoint.com/:x:/r/sites/AutoADROWPipeline/_layouts/15/Doc.aspx?sourcedoc=%7876A1D770-C3E4-

File Home Insert Share Page Layout Formulas Data Review View Automate Help Draw

Clean Data with Copilot Copilot has 12 suggestions to clean your data Show suggestions

D69 Data center migration and support

| | # | Customer | Opportunity | TCV ($M) | Current Status | Estimated Start Da | Duration | Q1 impa | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | $ 1,219.88 | | | | | |
| 19 | 17 | Magna | Magna GBS Next Gen Transformation | $ 2.60 | RFP response submitted | 1-Jun | 1 yr | 0 | Client Proposal evalution in progress |
| 20 | 18 | Magna | Cosma MIP Integration | $ 2.20 | RFP response due 4/18 | 1-Jun | 1 yr | 0 | RFP response due 4/18 |
| 21 | 19 | Joyson | ServiceNow HAM/SAM implementation | $ 1.50 | Initial Discussion Initiated, Proactive | 1-Jul | 10-12 Months | 0 | In discussion with customer |
| 22 | 20 | Joyson | EDI Platform as Service | $ 1.10 | Initial Discussion Initiated, Proactive | 1-Jul | 1 Year | 0 | In discussion with customer |
| 23 | 21 | Hanon | ECC to SAP S4 | $ 4.00 | Customer is in planning stage | 1-Sep | 1.5 Years | 0 | In discussion with customer |
| 24 | 22 | Joyson | SAP S4 Mexico Rollout | $ 2.70 | Proposal Submitted | 1-Jun | 2 Years | 100k | Proposal Evaluation in progress |
| 25 | 23 | Wabtec | Service Desk and Destop Support | $ 3.00 | RFP response being worked out | 1-Jul | 1 Year | 0 | Solution and req elicitation is WIP |
| 26 | 24 | Rivian | HR Offshore RFP | $ 3.30 | RFP response submitted | 1-Jul | 5 year | 0 | Client Proposal evalution in progress |
| 27 | 25 | Rivian | Commercial Accounting & Vehicle Management System RFP | $ 1.70 | RFP scoping discussions in progress; met w/Client to validate scope details and timelines 4/11/25 | 15-Jun | 8 mos | 0 | RFP response due 4/16 - we have req extension to 4/23 |
| 28 | 26 | Rivian | Warranty and Service Managment RFP | $ 2.00 | RFP scoping discussions in progress; met w/Client to validate scope details and timelines 4/11/25 - The scope will require a two (2) phase approach for assessment/architecture/design | 1-Jul | 18 mos | 0 | RFP response due 4/16 - we have req extension to 4/23 |

Opportunities

Workbook Statistics

10:25 AM 4/15/2025

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ____________________**

**INFOSYS LIMITED,** **Hon. ________________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 9** | Kratika Gupta, BPHR Email – Performance Rating Revenue KPI Showing as Zero Actuals, No Account Assignment |



Delete Archive Report Reply All Forward Share to Teams All Apps Quick Steps Move Tags Editing Immersive Translate Zoom Reply with Scheduling Poll Report Message Copilot for Sales InfyMe

Zero Actuals - Action needed

Kratika Gupta
To Jane Doe
Cc Rakesh Babu Gollapalli; Sukanya Bose(HRD)
Internal\Companywide usage

Thu 3/23/2023 8:18 AM

Hi Natalie,

You have zero actuals flowing in the Revenue KPI as you are not mapped as the MCO/portfolio owner for any account. It is imperative to get the correct mappings done in the system before end of this month. Please take it on priority and get it done.

| EmpNo | Emp Name | Role | PU | ParameterName | Target | Final Actuals | Zero Reasons |
|---|---|---|---|---|---|---|---|
| | Jane Doe | Engagement Manager | MFGCAMRSL | Revenue (in $ Mn) | 15 | 0 | You are not mapped as an MCO/Portfolio owners for any accounts |

Thanks & Regards,
Kratika Gupta
HR, COREMFG

8:47 AM
3/25/2025

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ____________________**

**INFOSYS LIMITED,** **Hon. ________________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 10** | AutoTech Detroit – Praise from Leadership – Rakesh Gollapalli |



Re: MFG CSG Automotive Team - Event Highlights and Recap: AutoTech Detroit 2024

Dewole Aradeon
To: Sanjay Sharma
Cc: Rakesh Babu Gollapalli; Biswajit Pattnaik

Jane Doe

Internal/Companywide usage

Jane

Special thanks to you for anchoring and relentlessly driving this . The event would not have been possible without the mountains you moved.

Thanks Sanjay for your leadership and ensuring we get participation from Ford and other auto execs.

Thanks to all the Detroit based auto CSG team - Rod, Srini, Biswajit, Suhas, Steve , Bawick, Anand and others .

Thanks to Thomas from Intech, Matt from Kaleidescope , Michelle from Wongdoody , Gagan and team from Engg , Vivek and team from BPM and Rick.

Tanya , thanks a lot for your support at such short notice.

Let us now start converting the leads, we already have had a few follow on discussions with Flex n gate and Cooper.

Rakesh Gollapalli

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. __________________**

**INFOSYS LIMITED,** **Hon. ______________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 11** | AutoTech Detroit – Praise from Leadership – Dewole Aradeon |


Re: MFG CSG Automotive Team - Event Highlights and Recap: AutoTech Detroit 2024 - Message (HTML)
File Message Help Tell me what you want to do
Re: MFG CSG Automotive Team - Event Highlights and Recap: AutoTech De
Dewole Aradeon
To Sanjay Sharma
Cc Rakesh Babu Gollapalli; Biswajit Pattnaik
Jane Doe
Internal\Companywide usage
Fri 6/14/2024 5:45 PM
I agree with you Rakesh, Jane energy was contagious. What she achieved in less than a month is not a small feat considering the complexities involved.
We were able to put a very good story in front of customers from digital (Wongdoody) to physical (Kaleidoscope) design, product engineering (Engineering) and validation (inTech) to support (BPM) for SDVs.
Thanks Raghav for your help, inTech team's presence really got a lot of customers excited. I am sure Matt will also have very busy next few weeks from the leads he got for Kaleidoscope.
Gagan: I owe you one for carrying 50Lb package with you from Indy and the last minute creative help to get the banners ready on time.
Rakesh, Michelle and Josh: Thanks a lot for enabling the fireside chat with Zafar from Ford, our session was a big hit.
Ben/Matt/Dawn/Dewole/Shamuktha: Thanks a lot for your help in getting the funding processed and vendor empanelment done so quickly, this event was not possible without this help.
Thanks,
1:05 PM
6/27/2025

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ________________**

**INFOSYS LIMITED,** **Hon. ____________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 12** | Performance Praise – Charles Salameh, Infosys SVP |

FW: IMPORTANT Ford Titan Program - AutoTech: Detroit 2023 Participation - Message (HTML)

File Message Help Tell me what you want to do

## FW: IMPORTANT Ford Titan Program - AutoTech: Detroit 2023 Participation

Jane Doe

Internal\Companywide usage

Tue 5/27/2025 12:53 PM

**From:** Charles Salameh <charles.salameh@infosys.com>
**Sent:** Wednesday, May 31, 2023 9:51 AM
**To:** Jasmeet Singh <J_Singh@infosys.com>; Rakesh Babu Gollapalli <Rakesh_Gollapalli@infosys.com>; Jane Doe
**Cc:** Rajiv Puri <rajiv.puri@infosys.com>; Dewole Aradeon <dewole.aradeon@infosys.com>; Shamuktha R <Shamuktha_R@infosys.com>
**Subject:** RE: IMPORTANT Ford Titan Program - AutoTech: Detroit 2023 Participation

Ok team – if we wish to do this lets do it like a 17B compa Jane did an excellent job defining the investment – better then most I get so give her props for getting the budget from me. Dewole pls process the full 21K budget for this event – Shamuktha will take care of the cost admin

I would like to hear how this works out team

charles

**From:** Jasmeet Singh <J_Singh@infosys.com>
**Sent:** Wednesday, May 31, 2023 9:44 AM
**To:** Rakesh Babu Gollapalli <Rakesh_Gollapalli@infosys.com>; Charles Salameh <charles.salameh@infosys.com>
**Cc:** Rajiv Puri <rajiv.puri@infosys.com>; Dewole Aradeon <dewole.aradeon@infosys.com>
**Subject:** RE: IMPORTANT Ford Titan Program - AutoTech: Detroit 2023 Participation

1:21 PM 6/27/2025

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ____________________**

**INFOSYS LIMITED,** **Hon. ________________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 13** | Client Advocacy Award – Urgent Email on August 1, 2025 |



RE: Natalie McCants - RE: Urgent - Requesting Your Headshot/Picture

Shaoli Ghosh
To Jane Doe
Cc [redacted]

Internal\Companywide usage

**From:** Shaoli Ghosh <shaoli.ghosh@infosys.com>
**Sent:** Tuesday, July 8, 2025 5:27 AM
**To:** Jane Doe
**Cc:** [redacted] <atif.hussain@infosys.com>
**Subject:** Urgent - Requesting Your Headshot/Picture

Hi Jane

Hope you are doing well

We're finalizing the winners for the upcoming Client Advocacy Program – Guardians of the MFG Galaxy presentation for Q1

For us to include your picture in the deck, could you please send over your **headshot or a high-resolution picture** as soon as possible?

Thanks

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ________________**

**INFOSYS LIMITED,** **Hon. ____________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 14** | Infosys Mutual Arbitration Agreement – VIII, Place of Arbitration (County) |

Infosys®

**ATTACHMENT 2**
**MUTUAL ARBITRATION AGREEMENT**

This Mutual Arbitration Agreement ("Agreement") provides Infosys Limited ("Infosys"), its parents, subsidiaries, affiliates, successors and assigns and, you, the individual Signer ("Signer") a fair and efficient process to resolve certain claims and disputes arising out of or related to your employment application submitted to and, if hired, future employment relationship with Infosys.

This Agreement is a contract that creates a binding obligation and covers important issues regarding your relationship to Infosys. It is your sole responsibility to read and understand it.

I. INTRODUCTION. By entering this Agreement, Infosys and Signer agree to resolve covered claims and disputes as provided for in this Agreement before a neutral arbitrator. The Federal Arbitration Act (9 U.S.C. §1 *et seq.*) shall govern this Agreement, which evidences a transaction involving commerce. All disputes covered by this Agreement between Signer and Infosys shall be decided by a neutral arbitrator in an arbitration proceeding and not by a judge or jury in a court proceeding.

II. DISPUTES AND CLAIMS COVERED BY THIS AGREEMENT. Infosys and Signer mutually understand, contract, and agree to the resolution by arbitration of all claims, disputes, or controversies, past, present, or future, including without limitation, claims that arise out of or relate to Signer's recruitment, employment, or separation from employment with Infosys, including claims involving any current or former officer, director, shareholder, agent or employee of Infosys.

The covered disputes that are subject to arbitration under this Agreement are those that, in the absence of this Agreement, could have been brought in court under applicable state, federal or other law. Unless specifically excluded below, this Agreement applies, without limitation, to any claims based upon or related to discrimination, harassment, retaliation, defamation (including claims of post-employment defamation or retaliation), breach of a contract or covenant, fraud, negligence, emotional distress, breach of fiduciary duty, trade secrets, unfair competition, overtime, wages or other compensation, breaks and rest periods, claims arising out of or relating to the grant, exercise, vesting and/or issuance of equity in Infosys or options to purchase equity in Infosys, termination, tort claims, equitable claims, and all statutory and common law claims. The Agreement specifically covers, without limitation, all claims arising under Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866 and 1871, the Civil Rights Act of 1991, 42 U.S.C. § 1981, the Americans With Disabilities Act, the Age Discrimination in Employment Act, the Family Medical Leave Act, the Fair Credit Reporting Act, the Fair Labor Standards Act, the Equal Pay Act, the Genetic Information Non-Discrimination Act, each as amended, any state or local statutes, if any, addressing the same or similar subjects, and any and all claims for violation of any federal, state or other governmental law, statute, regulation, or ordinance, except claims excluded in the section of this Agreement entitled "Disputes and Claims Not Covered by this Agreement."

III. DISPUTES AND CLAIMS NOT COVERED BY THIS AGREEMENT. Signer and Infosys understand and agree that the following claims and disputes are not covered by this Agreement and may therefore be resolved in any other appropriate forum as required by the laws then in effect:

- claims for workers' compensation benefits, unemployment insurance, or state or federal disability insurance;
- claims for benefits under a plan that is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"); however, this Agreement does apply to any claims for breach of fiduciary duty, for penalties, or alleging any other violation of ERISA, even if such claim is combined with a claim for benefits;
- claims for temporary or preliminary injunctive relief (including a temporary restraining order) in aid of arbitration, or to maintain the status quo pending arbitration, in a court of competent jurisdiction in accordance with applicable law;
- claims for collection of debt or other damages from Signer owed to Infosys due to fraudulent expense reimbursement requests or using the Infosys corporate credit card for personal and/or unauthorized purchases. However, if Signer brings a claim against Infosys pursuant to this Agreement, Infosys may, at its discretion, assert as a counterclaim any claims meeting the description of this paragraph;
- any other dispute or claim that has expressly been excluded from arbitration by statute.

The Arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable. However, as stated below in Section IV entitled "WAIVERS," the preceding sentence shall not apply to the class, collective, and representative actions described in the Waivers section.

Nothing in this Agreement should be interpreted as restricting or prohibiting the Signer from filing a charge or complaint with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the Department of Labor, the OccupationalSafety and Health Commission, any other federal, state, or local administrative agency charged with investigating and/or prosecuting complaints under any applicable federal, state or municipal law or regulation (except that the parties acknowledge that the Signer may not recover any monetary benefits in connection with any such claim, charge or proceeding). A federal, state, or local agency would also be entitled to investigate the charge in accordance with applicable law. However, any dispute or claim that is covered by this Agreement but not resolved through the federal, state, or local agency proceedings must be submitted to arbitration in accordance with this Agreement.

IV. WAIVERS. Infosys and Signer hereby waive any right for any dispute to be brought, heard, decided or arbitrated as a class, collective, and/or representative action.

(a) CLASS ACTION WAIVER. To the extent permitted by law, all covered claims under this Agreement must be brought by Infosys or Signer in an individua l capacity and not as a plaintiff or class member in any purported CLASS OR COLLECTIVE ACTION proceeding either in court or in arbitration ("Class Action Waiver"). Nor shall the Arbitrator have any authority to hear or arbitrate any such dispute.

Notwithstanding any other clause in this Agreement, the Class Action Waiver shall not be severable from this Agreement in any instance in which the dispute is brought or maintained as a class and/or collective action.

(b) REPRESENTATIVE ACTION WAIVER. Infosys and Signer also hereby waive any right for any dispute to be brought, heard, decided, or arbitrated as a PRIVATE ATTORNEY GENERAL REPRESENTATIVE ACTION ("Representative Action Waiver"). Nor shall the Arbitrator have any authority to hear or arbitrate any such dispute.

The Representative Action Waiver does not apply to any claim that Signer brings in arbitration as a private attorney general solely on his/her own behalf and not on behalf of or regarding others. The Representative Action Waiver shall be severable from this Agreement in any case in which there is a final judicial determination that the Representative Action Waiver is invalid, unenforceable, unconscionable, void or voidable. In such instances and where the claim is brought as a private attorney general, such private attorney general claim must be litigated in a civil court of competent jurisdiction.

Notwithstanding any other clause or language in this Agreement and/or any rules or procedures that might otherwise apply by virtue of this Agreement or by virtue of any arbitration organization rules or procedures that now apply or any amendments and/or modifications to those rules, any claim that the Class Action Waiver or Representative Action Waiver, or any portion of the Class Action Waiver or Representative Action Waiver is unenforceable, inapplicable, unconscionable, or void or voidable, shall be determined only by a court of competent jurisdiction and not by an arbitrator. No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration.

V. TIME TO FILE CLAIMS. We understand and agree that the party initiating the claim must make a written request for arbitration of the claim to the other party no later than the expiration of the statute of limitations (deadline for filing) that the law prescribes for the claim. The failure to submit a written request for arbitration within this time frame will constitute a waiver of all rights to raise those claims either through arbitration or otherwise that are subject to this Agreement. The Arbitrator will resolve all disputes regarding the timeliness or propriety of the request for arbitration and the apply the statute of limitations that would have applied if the claim(s) had been brought in court.

VI. PROCEDURE FOR SUBMITTING A REQUEST FOR ARBITRATION. A written request for arbitration of claims under this Agreement against Infosys shall be sent to the attention of Infosys Limited at the following address:

**CT Corporation System**
**1999 Bryan Street, Suite 900**
**Dallas, Texas 75201**

In the event that Infosys requests arbitration under this Agreement, Infosys shall send written notice to the last mailing address and personal email address it has on file for Signer.

VII. SELECTION OF NEUTRAL ARBITRATOR. The parties shall select the neutral arbitrator by mutual agreement. Unless the parties jointly agree otherwise, the Arbitrator shall be an attorney experienced in employment law and licensed to practice law in the state in which the arbitration is convened, or a retired judge from any jurisdiction in the United States. The process for selecting an Arbitrator is as follows: Within twenty-one (21) days of receipt of the request for arbitration, the responding party shall tender to the complaining party a list of at least five names of acceptable arbitrators. Within twenty-one (21) days thereafter, the complaining party shall notify the responding party whether any of the proposed arbitrators are acceptable and, if none of the responding party's proposed arbitrators are acceptable, the complaining party shall tender to the responding party a list of at least five acceptable arbitrators. The responding party shall notify the complaining party within ten (10) days whether any of the complaining party's proposed arbitrators is acceptable.

In the event that the parties do not mutually agree to an arbitrator, the Arbitrator shall be selected as follows: The American Arbitration Association ("AAA") shall give each party a list of eleven (11) arbitrators drawn from its panel of arbitrators. Each party shall have ten (10) calendar days from the postmark date on the list to strike all names on the list it deems unacceptable. If only one common name remains on the lists of all parties, that individual shall be designated as the Arbitrator. If more than one common name remains on the lists of all parties, the parties shall strike names alternately from the list of common names, with the party to strike first to be determined by a coin toss, until only one remains. If no common name remains on the lists of all parties, the AAA shall furnish an additional list of eleven (11) arbitrators from which the parties shall strike alternately, with the party striking first to be determined by a coin toss, until only one name remains. That person shall be designated as the Arbitrator. If for any reason, that person cannot serve, the AAA shall issue another list of eleven (11) arbitrators and repeat the alternate strike selection process.

If for any reason the AAA will not administer the arbitration, either party may apply to a court of competent jurisdiction with authority over the location where the arbitration will be conducted to appoint a neutral Arbitrator.

VIII. PLACE OF ARBITRATION. Unless the parties jointly agree otherwise, the arbitration ***shall take place in the county in which the Signer applied to work, works, or worked at the time the dispute or claim arose.*** If, however, such place is outside the United States, the arbitration shall take place in Dallas County, Texas, unless the parties jointly agree otherwise.

IX. ARBITRATION RULES AND PROCEDURES. We understand and agree that the arbitration shall be conducted in accordance with the then current American Arbitration Association Employment Arbitration Rules and Mediation Procedures ("AAA Employment Arbitration Rules"), except as otherwise provided in this Agreement. The AAA Rules are also

available via the internet at www.adr.org/employment or by using a service such as www.google.com to search for "AAA Employment Arbitration Rules".

Each party shall have the right to take the deposition of up to two individual witnesses and any expert witness designated by another party with each party having the right to designate only one expert. Each party also shall have the right to propound 15 requests for production of documents and 10 interrogatories to any party. Additional discovery may be had by mutual agreement of the parties or where the Arbitrator selected so orders pursuant to a showing of good cause by either party. Each party shall have the right to subpoena witnesses and documents for the arbitration, including documents relevant to the case from third parties, for the arbitration hearing. The Arbitrator shall apply the Federal Rules of Civil Procedure to resolve discovery disputes.

The Arbitrator shall have no authority to issue any third-party subpoenas seeking production of information or testimony before the arbitration hearing unless the Federal Court of Appeals for the federal district that would otherwise have jurisdiction over the dispute has expressly stated that the Federal Arbitration Act authorizes the Arbitrator to issue such subpoenas.

The Arbitrator shall have jurisdiction to hear and rule on pre-hearing disputes and is authorized to hold pre-hearing conferences by telephone or in person, as the Arbitrator deems necessary. Each party shall have the right to bring dispositive motions, including motions to dismiss and/or motions for summary judgment. The Arbitrator shall apply the standards for those motions under the Federal Rules of Civil Procedure.

The Federal Rules of Evidence shall apply to the arbitration proceedings. Either party may obtain a court reporter to provide a stenographic record of the proceedings. Either party, upon request at the close of the hearing, shall be given leave to file a post-hearing brief. The Arbitrator will set the time for filing such a brief.

To the extent that any of the AAA Employment Arbitration Rules or anything in this Agreement conflicts with the arbitration procedures required by law, the arbitration procedures required by law shall govern. Signer and Infosys also agree that nothing in this Agreement relieves either of them from any obligation they may have to exhaust certain administrative remedies before arbitrating any claims or disputes under this Agreement.

X. AWARD AND DECISION. The Arbitrator will issue a decision and award in writing, including the factual and legal basis for the decision. The Arbitrator may award to the Signer or to Infosys any remedy to which that party is entitled under applicable law (including, but not limited to, legal, equitable, and injunctive relief), but such remedies are limited to those that would be available to a party in his or her individual capacity in a court of law for the disputes presented to and decided by the Arbitrator. The Arbitrator is without jurisdiction to apply any different substantive law. The award may be entered in any court of competent jurisdiction.

XI. FINAL AND BINDING ARBITRATION. We understand that the arbitration of disputes and claims under this Agreement shall be instead of a trial before a judge and/or jury in a court proceeding. We also understand and agree that the Arbitrator's decision will be final and binding

on both Infosys and the Signer, subject to review on the grounds set forth by the laws of State where the Signer was or is primarily employed by Infosys.

XII. COSTS OF ARBITRATION. Infosys will pay the Arbitrator's and arbitration fees and costs, except for the filing fee, if any, as required by the organization through which the arbitration is conducted. If the Signer is financially unable to pay a filing fee, he or she will be relieved of the obligation to pay the filing fee. If the law (including the common law) of the jurisdiction in which the arbitration is held requires a different allocation of arbitral fees and costs for this Agreement to be enforceable, then such law shall be followed. Any disputes as to the fees, costs, and the law that applies to fees and costs will be resolved by the Arbitrator.

Each party shall for its own costs and attorneys' fees, if any. The Arbitrator will not have authority to award attorneys' fees unless a statute or contract at issue in any award of attorneys' fees as required or permitted by the applicable law. The Arbitrator will resolve any dispute as to whether Infosys or the Signer is the prevailing party in the arbitration.

XIII. GOVERNING LAW. The parties agree that Infosys is engaged in transactions involving interstate commerce. We understand that this is an Agreement to arbitrate under the Federal Arbitration Act, 9 U.S.C. §1 *et seq*. To the extent not inconsistent with the Federal Arbitration Act, this Agreement and its interpretation, validity, construction, enforcement and performance, as well as disputes and/or claims arising under this Agreement, shall be governed by the law of the State of Texas.

XIII. SEVERABILITY. Except as provided in Section IV "Waivers" above, if any provision of this Agreement is adjudged to be void, voidable or otherwise unenforceable, in whole or in part, such provision shall be severed from this Agreement. All remaining provisions shall remain in full force and effect.

IX. CONSIDERATION. Infosys and the Signer agree that the mutual obligations by each to arbitrate disputes provide adequate consideration for this Agreement.

X. ENTIRE AGREEMENT. We understand and agree that this Agreement is the sole and complete agreement between the parties on the subject of arbitration of disputes, except that if Signer and Infosys have a pre-existing agreement to arbitrate, and this Agreement is declared invalid, then the pre-existing agreement to arbitrate shall remain controlling. Further, we agree that this Agreement shall not supersede any arbitration agreement in connection with any benefit plan. This Agreement shall survive the termination of the Signer's employment with Infosys and the expiration of any benefit. No party is relying on any representations, oral or written, on the subject of the effect, enforceability, or meaning of this Agreement, except as set forth in this Agreement. Notwithstanding any contrary language, if any, in any Infosys policy or handbook, this Agreement may not be modified, revised or terminated absent a writing signed (electronically or otherwise) by both parties.

XI. NOT A CONTRACT OF EMPLOYMENT. This Agreement does not alter the "at-will" status of my employment. This Agreement is not, and shall not, be construed to create, any contract of employment, express or implied.

**Knowing and Voluntary Agreement**

WE UNDERSTAND AND AGREE THAT WE HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY OF OWN CHOOSING BEFORE ACCEPTING THIS AGREEMENT (THROUGH SIGNATURE OR ELECTRONIC ACCEPTANCE), AND WE HAVE HAD AN OPPORTUNITY TO DO SO. BY ACCEPTING THIS AGREEMENT, WE ACKNOWLEDGE WE HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND WE ARE WAIVING ALL RIGHTS TO A TRIAL OR HEARING BEFORE A JUDGE OR JURY OF ANY ALL DISPUTES AND CLAIMS SUBJECT TO ARBITRATION UNDER THIS AGREEMENT.

**Infosys Limited**

**Richard Lobo**
**EVP and Head Human Resources -Infosys Limited**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ________________**

**INFOSYS LIMITED,** **Hon. ____________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 15** | Account on a Page – Activity from October 1, 2024, to August 25, 2025 |

## Account - Plan On A Page

**Account: Rivian**

**MCO: Natalie McCants**

| CEO | COO | CFO | Engg | CMO | CHR | CPO | MFG | BPM |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| M$ | FY25 | Q1 | Q2 | Q3 | Q4 | FY26 |
|---|---|---|---|---|---|---|
| Revenue | 1087.0 | .169 | .2 | .4 | .6 | 1.37 |
| OM | 38 | 33 | 33 | 35 | 30 | 33 |
| Vol | 110 | 9 | 9 | 14 | 20 | 110 |
| AI Rev | 0.0 | 0.0 | 0.0 | 0.2 | 0.8 | 1.0 |

**% Share**

| ADM | Engg | CIS | EAIS | DNA | BPM | Others |
|---|---|---|---|---|---|---|
| 0 | 99 | 0 | 0 | 0 | 0 | 1 |

**Revenue From %**

| FP | T&M | Oth |
|---|---|---|
| 100% | 0% | 0% |

**Project Type**

| Run | Transform |
|---|---|
| 90% | 10% |

| Opp Top | TCV | ETA | Status |
|---|---|---|---|
| SAP AMS Support Services RFP | $8M | Jan 2026 | Submission is due 8/12/25 |
| RV Tech SAP Cloud Implementation RFP | $2.3M | Sept 2025 | Submission is due 8/5/25 |
| Digital Workplace Services RFP | $5.1M | Aug 2025 | Revised pricing to re-engage in the process due 8/5/25 |
| ServiceNow Transformation RFP | | Oct 2025 | Submission due /25 |
| Netvibes Workforce Empowerment Solution | $500K | Nov 2025 | Proposal due 9/15/25 |
| ENG MES Extension/Renewal | $400K | Jun 2026 | Extension/Renewal will be due May 2025 |

### Top Growth Strategies and what you have done:

- **Grow Engg ($350K in Revenue by End of Year)**
  - Meet w/Rivian and RivTech Engg leaders – Raghav/GV
    - Eric Duester – Factory IT Ops, Carlo Materazzo – VP, Logistics and Manufacturing
  - Pontoon/VNDLY (MSA) for staff resource support
  - Product Development (Jim Fullana/Rishi Kaki) – Sourcing Optimization
- **SAP ERP Technology (TCV $$8M by End of Year)**
  - SAP AMS RFP – take back this project; key to growth and scale
    - Best bet for long-term annuity revenue boost
  - SAP Cloud Implementation RivTech – key to increasing Rivan Executive relationship conversations; ground floor Strategic Partnership oppty
- **Proactive AI Push ($500K in Revenue by End of Year)**
  - Include in all RFPs – client.ai and service.ai
  - SAP GenAI proactive proposal for VMS/Warranty
- **Convert Two (2) of the current RFPs by End of Year**
  - RFP win rate = .50%
  - $9.25 revenue and

## Other Details: Rivian

| | Date | Business Area | Buyer | Disposition |
|---|---|---|---|---|
| **Vehicle Management Services** | **25-Mar-25** | Operations | Stephanie Simkow | After a second round of pricing submissions, Rivian determined they could not move forward due to budgeting constraints |
| **Warranty Management** | **26-Mar-25** | Operations | Stephanie Simkow | after a second round of pricing submissions, Rivian determined they could not move forward due to budgeting constraints |
| **HR Offshore Support** | **10-Apr-25** | Human Resources | Jake Beham | Infosys down-selected for Orals - 4/28/25<br>• Infosys was not selected as winning supplier<br>• Infosys scored highest overall on Proposal<br>• Infosys scored second in Pricing<br>• Infosys scored lowest in Orals Presentation |
| **Digital Workplace Services** | **22-Apr-25** | Enterprise Technology | Jake Beham | Infosys was eliminated from the process in the first round - Pricing was not competitive; Revising Pricing based on details provided - in attempt to re-enter the process (need to adjust by $800K to $900K |
| **SAP AMS Support** | **11-Jul-25** | Infra Software Services | Jake Beham | In Process |
| **RV Tech SAP Cloud Implementation** | **22-Jul-25** | RivTech - new entity | Kim Busta | In Process |
| **ServiceNow Transformation** | **1-Aug-25** | Enterprise Technology | Stephanie Simkow | Process Kick-off 8/4/25 |
| **Pontoon VNDLY MSP Participation Request** | **18-Apr-25** | Sourcing | Anthony Dazzo/Jake Beham | In Process/ Under review by IL legal |
| **Proactive Proposals** | | | | |
| **Netvibes** | **4-Sep-25** | ENG/Sourcing and Procurement | Jim Fullana, Brad Hood | Finalizing Solution Scope for Presentation to Rivian in early September. Solution includes EdgeVerve AI and Automation, Engineering and Alliances (Dassault) |
| **VMS/Warranty GenAI Automation Support** | **20-Aug-25** | Professional Services | Stephanie Simkow | This would be a sole source proposal to re-engage in the VMS/Warranty project to provide Automation services |

DELL

# Other Details: Rivian

- Rivian will open an East coast HQs in Atlanta by end of 2025 with 100 business services employees hired by December with anticipation to grow the HQs to 500 employees/
  - Rivian anticipates opening their Atlanta metro production plant in 2028.
- Signed NDA with RV Tech to participate in their RFP processes. – July 21, 2025
  - RV Tech is a collaboration between Rivian and VW, officially known as RivTech which was officially formed in November 2024 to support Rivian's technical collaboration with VW to provide foundational technology for their EV program.
- RV Tech SAP Cloud opportunity is a 'must have" win to gain access to ground floor partnership with RivTech (Rivian and VW) executives
- ServiceNow opportunity could include licensing opportunity
- in-tech has agreed to assist with engaging VW personnel for a roundtable workshop with Rivian.
- Pontoon Go/No Go decision may impact current MES roles and any additional ENG resource roles; RV Tech will use VNDLY (Pontoon MSP portal) as the primary pipeline for their staffing needs

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ____________________**

**INFOSYS LIMITED,** **Hon. ________________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 16** | Email – re: Plaintiff's Residential Address Revealed to Sanjay Sharma by HR |

Re: Separation Details EE# 1137783

N

Jane Doe

Mon, Aug 25, 2025, 4:53 PM

to Michelle

Michelle:

I mentioned that I was not comfortable sharing my address while we were on this afternoon's call.

However, I see that you have included Sanjay Sharma in this email, which includes my address.

This is very concerning for me because I have safety concerns regarding someone (Sanjay Sharma) who feels comfortable "gifting" an illicit marijuana product to me that includes the words "Knockout Blend" and has access to my home details.

I want to go on record that I expressed I did not want to share that information in the chat and sent the address directly to you for this reason.

Also, the travel reimbursement Excel spreadsheet is not downloadable, and I will need the travel request numbers because I do not have access to that information.

Jane Doe

From: **Michelle Bedell** <michelle.bedell@infosys.com>
Date: Mon, Aug 25, 2025 at 12:17 PM
Subject: Separation Details EE# 1137783
To: Jane Doe
<n [redacted]
Cc: Sanjay Sharma <sanjay.sharma12@infosys.com>, Aditya Dhal (HRD) <Aditya_Dhal@infosys.com>

Hello Jane Doe

Thank you again for your time. I know these conversations are not easy, so I truly appreciate your time during the call. The decision to terminate your employment is based on your performance during the last performance appraisal cycle and is in line with Infosys Policies and Processes.

As discussed, your employment with Infosys ends on **Aug 25th, 2025**

- **Personal email ID:** [redacted]
- **Phone number:** [redacted]
- **Mailing address:** [redacted]

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ________________**

**INFOSYS LIMITED,** **Hon. ____________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 17** | Infosys Offer Letter |

INFOSYS LIMITED
2400 N Glenville Dr
Suite C150
Richardson, TX 75082
T: 214-306-2100
F: 469-518-3858
www.infosys.com

HRD/US/ONDEL/14801159/2022 May 7, 2021

Jane Doe

Dear Jane

We at Infosys believe our employees are our most valued asset and key to us achieving our goals. It is our continuing ambition to find and retain people who believe in our values and share our desire to build a great Company. Based on our recent discussions with you and our review of your profile, it is with great pleasure that we offer you the below position with Infosys Limited in Richardson, TX.

Role: Engagement Manager

Role Designation: 2817ASMCS : Senior Manager - Client Services

Due to the nature of your Role, you actual work location may vary. Your Personal Level will be 7.

With your acceptance of this offer, your employment with the company will commence on May 17, 2021. We request you to report in person on this date at Richardson, TX. However, due to the current COVID-19 outbreak we are onboarding remotely. Once you accept the offer, a welcome email will be sent with additional details on the same.

Your current role has been classified as exempt in accordance with federal and state wage and hour laws. Your fixed salary will be $ 186,550 per year and will be paid in accordance with the Company's bi-weekly payroll schedule, with pay date every other Friday. Pay period details are available with the annual payroll calendar in the Company's intranet, which will be available for your review once you join the Company.

In addition to your base salary, you will be eligible to participate in Infosys' Performance Bonus Plan. In order to receive any bonus payment, you must meet the eligibility requirements, as described in the Bonus Plan. Actual bonus payments will be determined by the Company based on individual performance and will be prorated based on the number of days worked in each bonus cycle. Under the Bonus Plan, the maximum bonus you will be eligible to earn is $ 100,457, or 53.85% % of your annual base salary. The Bonus Plan currently in effect is enclosed with this offer letter.

You are responsible for paying all taxes and levies as required under federal, state and/or local law. The Company will deduct taxes and levies from each pay check, as required by applicable law. You will be solely responsible for submitting all tax documentation and paying your individual taxes in accordance with the regulatory requirements.

You are also eligible to participate in Infosys' benefits program, including comprehensive medical and dental plans, life insurance, a long-term disability plan, and paid vacation and holidays. A summary of Infosys' benefits is included with this letter.

Your offer is contingent upon the following: (1) signing Attachment 1: Non-Compete and Non Solicitation Agreement, Attachment 2: Mutual Arbitration Agreement, Attachment 3: Confidential Information and Inventions Agreement, and Attachment 4: At-Will Employment Agreement; (2) satisfactory outcome of a criminal convictions disclosure and personal Background check which, depending upon your position and department, may include professional references, verification
of previous employment and education, criminal background check, drug screening, and/or a consumer credit check; and
(3) proof of eligibility to work in the United States by using the I-9 form, in compliance with the Immigration Reform and Control Act. For some employees, portions of a criminal convictions disclosure and background check might not be complete as of the date of joining. In these circumstances, you understand that if the check does not have a satisfactory outcome or if the Company cannot verify education or employment credentials, your employment could be subsequently terminated.

In the event you are eligible to apply for an H-1B work visa, Infosys will provide assistance in applying for the work visa. However, if a subsequent renewal or recertification of work authorization is required, Infosys may elect not to sponsor or reimburse the cost of obtaining such work authorization. If you rescind your acceptance of this offer of employment after Infosys has incurred costs for the filing of your H-1B transfer application, Infosys may recover such costs directly from you.

Infosys is an "at-will" employer. This means that either you or Infosys may terminate your employment at any time, with or without cause, and with or without prior notice. It also means that your job duties, title, responsibilities, reporting level, compensation and benefits, as well as Infosys's personnel policies and procedures, may be changed at any time. The "at-will" nature of your employment may only be changed by an express written agreement that is signed by you and by the Chief Executive Officer of Infosys Limited.

If you accept this offer, and the conditions of this offer are satisfied, this letter and the written agreements referenced in this letter shall constitute the complete agreement between you and Infosys with respect to the initial terms and conditions of your employment. Any representations, whether written or oral, which are not contained in this letter or contrary to those contained in this letter that may have been made to you are expressly cancelled and superseded by this offer, and you agree that you are not relying on any such promises.

To formalize your acceptance of this offer, please send us a mail confirmation to sunpreet.kaur@infosys.com and US_Onboarding@infosys.com within 5 business days from the date of this Offer letter. By doing so, you also accept and agree to the transfer of your personal information to the Company's head office located at Bangalore, India for the purpose of administering the human resources elements of its business.

This offer will be deemed to have been rejected by you if: (i) we have not received the mail acceptance within 15 calendar days from the date of this letter and you have not requested and been granted an extension of time to respond; or (ii) you notify Infosys in writing that you are rejecting the offer.

Infosys is an organization that has built an outstanding reputation for exciting, innovative and quality products and services. Credit for this goes to every one of our employees. We look forward to you accepting our offer and becoming part of the Infosys team.

Sincerely,

**Richard Lobo**
**EVP and Head Human Resources - Infosys Limited**

Enclosures:

Attachment 1 - Non-Compete and Non-Solicitation
Agreement Attachment 2 - Mutual Arbitration Agreement
Attachment 3 - Confidential Information and Inventions
Agreement Attachment 4 - At Will Employment Agreement
Attachment 5 - US Benefits at a
Glance Attachment 6 - Bonus Plan

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. ____________________**

**INFOSYS LIMITED,** **Hon. ________________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 18** | Equal Employment Opportunity Commission (EEOC) – Notice of Right to Sue Letter issued on June 29, 2026. |

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Dallas District Office**
207 S. Houston Street, 3rd Floor
Dallas, TX 75202
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 06/29/2026

**To:** Jane Doe [redacted]

Charge No: 450-2026-[redacted]

EEOC Representative and email: MAYELA JACKSON
EO INVESTIGATOR BILINGUAL
MAYELA.JACKSON@EEOC.GOV

---

### DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 450-2026-[redacted]

On behalf of the Commission,

Digitally signed by Mayela Jackson
Date: 2026.06.29 09:24:52 -05'00'

Travis Nicholson
District Director

**Cc: VIA EEOC PORTAL**

Infosys Limited, Inc.
Phani.gundapaneni@infosys.com

Please retain this Notice for your records.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. __________________**

**INFOSYS LIMITED,**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

**Hon. ______________________**

| | |
|---|---|
| **Exhibit 19a** | Public Corporate Governance Declarations on Harassment Policies (The Economic Times, July 3, 2025 & April 15, 2026) |

CHRO Club
#ChangeMaker: Shweta Mohanty, SAP India | S3 E03



CEO Chronicles
Uncovering the people agenda of the C-Suite




The Employer Fil
Where workforc
the future of wo

Industry **3 Min Read**

# Infosys reaffirms zero-tolerance policy am Pune harassment claims

In an official statement, Infosys emphasised its commitment to employee safety. "Infosys maintains a zero-tolerance approach to any form of harassment or discrimination. Any is reported is treated seriously and investigated by an independent committee. We encour a 'speak-up' culture for employees to report any concern."

**ANI**
Published On Apr 15, 2026 at 10:46 PM IST

Pune (Maharashtra) [India], April 15 (ANI): IT giant Infosys issued a formal statement on Wednesday addressing social media allegations of workplace harassment at its Business Process Management (BPM)




The controversy surrounding Infosys ignited after a series of posts on the social media platform X alleged inappropriate behaviour toward female employees in Pune

facility in Pune.

The company's response comes as Maharashtra's IT sector faces heightened scrutiny following a separate, severe criminal investigation into harassment and forced religious conversion at a TCS facility in Nashik.

The controversy surrounding Infosys ignited after a series of posts on the social media platform X alleged inappropriate behaviour toward female employees in Pune.

Advt

While the original posts have since been deleted, the issue drew a reaction from Maharashtra Minister Nitesh Rane, who confirmed the government has taken note of the claims.

In an official statement, Infosys emphasised its commitment to employee safety. "Infosys maintains a zero-tolerance approach to any form of harassment or discrimination. Any issue reported is treated seriously and investigated by an independent committee. We encourage a 'speak-up' culture for employees to report any concern."

The company noted that it has activated its internal robust processes and multi-channel preventive programs to investigate the claims, aligned with its global Code of Conduct.

"Any issue that is reported is treated seriously and investigated by an independent committee, as per our robust processes. In addition, there are proactive multi-channel preventive programs, including a 'speak-up' culture that encourages employees to report any concern," added the statement.

While further details regarding the specific allegations and any ongoing inquiry are awaited, it has been noted that the individual who initially alleged the misconduct has since deleted the social media posts.

The Infosys incident occurred against the backdrop of the Nashik TCS case, where several female employees at the company's Nashik facility were allegedly subjected to harassment in their workplace by senior staff between 2022 and 2026.

Advt

A total of 9 cases have been registered regarding the case, 1 case being at Deolali camp police station and 8 others at Mumbai Naka. A total of 9 complaints, including 1 man who has come forward with allegations of harassment, torture and forced religious conversion.

The entire matter began with a complaint by a woman employee, who alleged that a colleague established a relationship with her on the pretext of marriage. As the investigation progressed, seven other women also came forward with similar experiences, making the case more serious.

The complaints include allegations of sexual harassment, inappropriate touching, objectionable remarks, stalking, and mental pressure at the workplace. Some victims have also claimed that they were pressured to adopt certain religious practices or convert. Those arrested include Asif Ansari, Shafi Shaikh, Shahrukh Qureshi, Raza Memon and Tausif Attar. Another employee has also been arrested.

Advt

During the investigation, the police have examined more than 40 CCTV footages and are recording statements of the victims and the accused. An undercover operation was also conducted with the help of women police personnel to apprehend one of the accused.

Additonally, one of the accused, Ashwini Chainani, Operations Manager of the company, has been remanded to 14-day judicial custody.

The investigation is currently ongoing, and officials say that all aspects are being thoroughly examined, after which conclusions will be drawn.

**Published On Apr 15, 2026 at 10:46 PM IST**

See more on: Infosys harassment claims, TCS Nashik case, workplace harassment, Maharashtra IT sector, employee safety

## Comments

What are your thoughts?

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. __________________**

**INFOSYS LIMITED,**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

**Hon. ______________________**

| | |
|---|---|
| **Exhibit 19b** | Public Corporate Governance Declarations on Harassment Policies (The Economic Times, July 3, 2025 & April 15, 2026) |

# Infosys terminates employee over obscene act, says 'zero tolerance for any form of harassment'

*Meanwhile, Bengaluru police has also reportedly arrested the accused, who joined the company three months ago as Senior Associate Consultant*

By STORYBOARD18 | July 3, 2025, 11:38:28 IST

Choose Storyboard18 on Follow




Share

ADVERTISEMENT

Software service giant Infosys has sacked one of his employees who was caught filming a female colleague in the office restroom. The company has issued a public statement on the matter, saying the company has zero tolerance for any form of harassment. The IT giant has terminated the accused.

"We are aware of this incident and have taken necessary action against the employee, who is now separated from the Company. We also promptly supported the complainant by facilitating a swift complaint with the law enforcement authorities and continue to cooperate as they investigate further. Infosys is committed to providing an environment free of harassment and has a zero-tolerance policy. We take every complaint related to any violation of the Company's Code of Conduct seriously," Infosys said.

Infosys dismisses another 195 trainees in 4th round of layoff since Feb 2025

Meanwhile, Bengaluru police has also reportedly arrested the accused, identified as Swapnil Nagesh Mali, who joined the company three months ago as Senior Associate Consultant. He is a native of Sangli in Maharashtra.

According to a report by the Times of India, a 35-year-old woman, who works as a Share Technical Test Lead in the company, said that she noticed a reflection on the door while using the washroom.

She climbed on the commode to investigate and found a man standing in the

matter to the HR department. She also filed the police complaint.

The unfortunate incident occurred on June 30 at the Infosys Electronic City office, Bengaluru.

From Wipro to Infosys, India's IT giants see massive pay gap between CEOs and employees

The other colleagues also found the video of the woman on his phone, along with another obscene video of a different Infosys employee. Mali's phone also had 50 other downloaded videos from the internet.

The cops have registered a case under Section 77 (voyeurism) of the Bharatiya Nyaya Sanhita and relevant provisions of the Information Technology Act.

*Follow Storyboard18 on Google for the latest and breaking how it works news and industry updates, along with in-depth coverage of digital media and media & entertainment news. Stay nformed with the latest perspectives only on Storyboard18.*

**Tags**

trend Trending

FIRST PUBLISHED ON July 3, 2025, 11:38:28 IST

Share

LATEST NEWS SPECIAL COVERAGE WATCH LISTEN

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE,**
**Plaintiff,**

**v.** **Case No. _________________**

**INFOSYS LIMITED,** **Hon. _____________________**
**SANJAY SHARMA, and**
**RAKESH BABU GOLLAPALLI,**
**Defendants, Jointly and Severally.**

| | |
|---|---|
| **Exhibit 20** | Infosys Separation Letter |

From: **Michelle Bedell** <michelle.bedell@infosys.com>
Date: Mon, Aug 25, 2025 at 12:17 PM
Subject: Separation Details EE# 1137783
To [redacted] Jane Doe
<[redacted]
Cc: Sanjay Sharma <sanjay.sharma12@infosys.com>, Aditya Dhal (HRD) <Aditya_Dhal@infosys.com>

Hello Jane

Thank you again for your time. I know these conversations are not easy, so I truly appreciate your time during the call. The decision to terminate your employment is based on your performance during the last performance appraisal cycle and is in line with Infosys Policies and Processes.

As discussed, your employment with Infosys ends on **Aug 25th, 2025**

- **Personal email ID:** [redacted]
- **Phone number:** [redacted]
- **Mailing address:** [redacted]
- Please find attached.
  - Benefits Letter - includes additional information around 401K, Life Insurance, Employment Verification, etc.
  - Outplacement Flyer
- The severance agreement will be sent to you from the USA Agreement usa.agreement@infosys.com email ID to your personal email. The 4 weeks' severance is contingent upon return of the completed severance agreement by you
- Benefits - Your benefits coverage will end today, but you will receive information on COBRA at your home address via US Post in approximately 30 - 45 days. If you choose to enroll in the COBRA plan, the benefits will be retro-effected from tomorrow's date, and you will not see any gap in your coverage
- Equipment - Our CD-Assets team will be in touch with you for return of equipment – laptop, phone, secure id, Infosys ID badge, etc, you will get a pre-paid UPS label and you can pack the assets, drop them off at a UPS store or arrange a pick up from your home
- Access - Your access to Infosys systems will be disabled shortly.
- ADP access (where you receive your paystubs) and other external systems (like BSwift, Aetna, Vanguard, PayFlex, etc.)

- You will still have access to these external systems going forward, so keep your login information handy. You will need to use ADP to access your W2 for 2024 as well – please be sure to change your account info for these systems to a personal email address. As these systems/sites are external to Infosys, you can access them as needed, and through the apps on your phone as well

Corporate credit card (if applicable) – this will automatically be canceled on your behalf, so you will just need to make sure the balance is zeroed out, and then you may simply cut the card up/shred it and throw it away

Thank you.

Regards,

Michelle Bedell

Unit Manager – BPHR

Infosys

225 Asylum Street

Hartford, CT 06103

M: 469.982.2137

America's Portal Link for Regional Practice Leaders (RPL) & HR alignment per all regions:

https://infosystechnologies.sharepoint.com/sites/AmericasGeo

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS** Jane Doe

**DEFENDANTS** Infosys Limited
Sanjay Sharma
Rakesh Babu Gollapalli

**(b)** County of Residence of First Listed Plaintiff Fulton
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Dallas
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)* [section crossed out by hand]

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☒ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***: Title VII of the civil rights act of 1964, Age Discrimination in Employment Act (ADEA)

Brief description of cause: unlawful employment practices-discrimination, harassment, hostile work environment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. **DEMAND $** CHECK YES only if demanded in complaint: **JURY DEMAND:** ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

PURSUANT TO LOCAL RULE 83.11

1. Is this a case that has been previously dismissed?

☐ Yes
☒ No

If yes, give the following information:

Court: ______________________________

Case No.: ______________________________

Judge: ______________________________

2. Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)

☐ Yes
☒ No

If yes, give the following information:

Court: ______________________________

Case No.: ______________________________

Judge: ______________________________

Notes :